LOUIS E. TIFFANY ET AL., APPELLEES, V. FRANKLIN P. WRIGHT, APPELLANT.

FILED MAY 10, 1907. No. 14,683.

1. **Guardian and Ward.** Parents are guardians by nature and for nurture of all children born to them in lawful wedlock, under the laws of this state.

2. **Adoption.** Our statute of adoption (code, sec. 797) is based primarily on the consent of the parents, if living and accessible, and an adoption without such consent must come clearly within the exceptions contained in the statute.

3. ———. To warrant an adoption under the sixth subdivision of this section against the objection of a living parent of the child, it must be made clearly to appear that such parent had abandoned the child for a period of at least six months, and that the party consenting to such adoption has had the lawful custody during such period to the exclusion of all other control.

APPEAL from the district court for Keya Paha county: WILLIAM H. WESTOVER, JUDGE. *Reversed with directions.*

W. C. *Brown,* for appellant.

*Lear & Wilhite* and *H. M. Dural, contra.*

OLDHAM, C.

This cause was heard in the district court for Keya Paha county, Nebraska, on an appeal from a proceeding of adoption, instituted in the county court of said county, in which Louis E. Tiffany and Lilla Tiffany, husband and wife, were declared and adjudged to have legally adopted an infant child, named Minnie Wright. The appeal from the order was prosecuted by the father of the child, Franklin P. Wright, under the provisions of section 801*d* of the code, and on a hearing of the cause in the district court the appeal was dismissed and the judgment of the county court affirmed. To reverse this judgment the appellant in the court below has appealed to this court.

The facts underlying this controversy are that appellant, Franklin P. Wright, was a resident of Keya Paha county for several years prior to the year 1899, and lived with his wife and family of seven children on a farm in that county. In 1899 his wife died, leaving him with his seven children ranging in age from 4 to 14 years. After the death of his wife, the father kept the family together for some time, his oldest daughter, Ella, and his second daughter, Anna, taking care of the household for him. After living some time in this manner, Mr. Wright procured employment in Rock county, and took his family with him to that place and remained there until 1904, when he received employment at Sioux Falls, South Dakota, and went there to work. Before leaving Rock county, he arranged for homes for each of his children, including Minnie, the youngest of the family. He corresponded with the family regularly while in Sioux Falls, and was

informed as to their affairs by his daughter, Ella, who had
particular charge of the youngest child, Minnie, and vis-
ited and looked after her welfare.  After Mr. Wright had
gone to Sioux Falls under these circumstances, Mrs. Lilla
Tiffany, one of the appellees in this cause, asked Ella
Wright if she might not take Minnie home with her, say-
ing that she would clothe her, take good care of her, and
send her to school, if she would consent to her going, as
she (Mrs. Tiffany) had no children and wanted Minnie
to stay with her for company.  Mrs. Tiffany says there
was nothing said as to how long the child was to stay with
her, but Miss Ella Wright says that Mrs. Tiffany said she
would keep her until the sister or father wanted her.
After the child had lived with the Tiffanys under this
arrangement for nearly a year, it appears that there was
talk in the neighborhood that the child was being
neglected, mistreated, and not properly cared for by the
Tiffanys.  When Ella Wright heard it, she communicated
the rumor to her father, and went to see the Tiffanys, and
told them what she had heard.  They assured her there
was nothing in the rumor, and indicated their willingness
to give up the girl as soon as the rumors quieted down.
Shortly afterwards, the second daughter, Anna Wright,
took a letter from her father, and went with a neighbor
woman to the Tiffanys and demanded possession of the
child.  It appears that Mrs. Tiffany objected to giving
up the child without an order from Ella or her father,
and after a conference Mr. Tiffany agreed that he would
write to the father, and, if he could not get the father's
consent to have the child remain, he would deliver the
child to her sisters as directed.  The evidence is clear that
he equivocated as to the time at which he would give up
the child, and, instead of doing so, he filed an application
in the county court for the adoption of the child by him-
self and wife.  Mrs. Tiffany appeared in the proceedings,
and pretended to consent to the adoption as guardian
and legal custodian of the child.  Service of notice of the

adoption proceedings, which described the child as "the daughter of one ——— Wright," was had by publication in the county newspaper, and, no one appearing to object on the day of hearing, a decree of adoption was awarded by the court on September 18, 1905. As soon as the father heard of the proceedings, he returned to Keya Paha county, and on the 3d day of October, 1905, and within 30 days of the entering of the decree, appealed from the order and judgment to the district court.

While the evidence is in sharp conflict as to the alleged mistreatment of the child by Mr. and Mrs. Tiffany during her residence with them, we think the more probable testimony tends to support the finding of the district court that the charges were not sustained, and that the Tiffanys were proper persons for the care and custody of the child. On the other hand, there is no testimony in the record reflecting in any manner on the character of the father of the child, or tending to show that he was other than a dutiful and affectionate father to all his children. While he was poor in this world's goods, he had always made every reasonable effort in his power to provide for his children according to his means. It is true that he sent no money to provide for the support of his infant daughter Minnie, while she was living with the Tiffanys, but this was accounted for by their agreement to clothe and care for her in return for her services in the Tiffany household. The evidence shows that, when the father was informed that Minnie was being mistreated, he provided a home for her with his sister, and sent money and tickets to the older girls, and directed them to bring her to him.

Both by the civil and the common law the father was the guardian by nature and for nurture of every child born to him in lawful wedlock. This natural guardianship is extended by section 5376, Ann. St. 1903, to both father and mother alike, with the provision that, if either parent dies or is disqualified, the guardianship devolves upon the other, *Norval v. Zinsmaster,* 57 Neb. 158;

*Terry v. Johnson,* 73 Neb. 653. This guardianship may only be tranfserred to another by consent of the parents, if living, in the manner provided by law, unless the right of such consent has been surrendered by voluntary abandonment of the offspring, or forfeited by a resort to a life of vice or debauchery, or such as renders the parent an unfit guardian for the morals and welfare of the child.

For the beneficent purpose of providing homes for homeless infants, all of the states of this Union have enacted statutes of adoption, which are of civil and not of common law origin. These statutes are all primarily based upon the consent of the child's parent, or parents, if living and accessible, and the exceptions, which permit adoption without such consent, must clearly come within the provisions of the statutes. *Fergeson v. Jones,* 17 Or. 204, 20 Pac. 842; Rice, American Probate Law and Practice, pp. 551, 552. Our statute of adoption, section 797 of the code, provides: First, for the adoption of a legitimate child by the consent of both parents, when living; second, for the adoption of such child by the consent of the surviving parent, when one of the parents is dead; third, by the consent of the parent having the legal custody of the child, when the other parent has, without good cause, contributed nothing for its support for the period of six months; fourth, for the adoption of an illegitimate child by the consent of its mother; fifth, for the adoption by the consent of the person or corporation having custody of the child by a written instrument, signed by the parent or parents, authorizing the adoption. The sixth clause, under which this proceeding is sought to be sustained, is as follows: "Any person, corporation or association that shall have had the lawful custody or control of any minor child for the period of six months last preceding, for the support of which neither parent shall without just cause or fault have contributed anything whatever during said period, may consent to its adoption." The seventh clause provides for an adoption by consent of

a guardian appointed by the court and empowered by the court to consent, because of the cruelty, neglect, and unsuitableness of the child's parents.    These last two clauses of the statute are the only ones that authorize an adoption without the consent of one or both the natural parents of the child.    These two should be construed in *para materia* with the entire act.    *Burger v. Frakes*, 67 Ia. 460.    The sixth clause, above set out, when so construed, plainly intends to provide for the adoption of a child by consent of a guardian, when it has been abandoned and deserted by its natural parents, and the seventh clause contemplates an adoption by consent of a guardian appointed by the court, when the custody and control by the parents have been forfeited by a judgment of a court of competent jurisdiction for the vice or unfitness of the parents.    We are satisfied, after a review of the evidence, that there was no abandonment of the child, Minnie Wright, such as was contemplated in the sixth clause of the statute, *supra*, nor is it contended that there was any evidence that would bring this case within the provisions of the seventh clause.    We are further strongly impressed with the view that the pretended adoption proceedings were but a collusive and fraudulent attempt on the part of the Tiffanys to deprive the appellant of the natural guardianship of his child without just cause.    The specious pretense of legal guardianship of the child, under which appellee, Mrs. Tiffany, assumed to consent to the adoption, gives the entire proceedings an appearance too closely resembling an attempted kidnaping under cloak of the law to find favor in this court.

We therefore recommend that the judgment of the district court be reversed and the cause remanded, with directions to the district court to dismiss the petition for adoption.

AMES and EPPERSON, CC., concur.

By the Court: For the reasons given in the foregoing

opinion, the judgment of the district court is reversed and the cause remanded, with directions to the district court to dismiss the petition for adoption.

REVERSED.