BARBARA FISCHER AND JOHN FISCHER, HER HUSBAND, PETITIONERS, v. JOHN R. MEADER AND ANNIE B. MEADER, HIS WIFE, AND NEW JERSEY STATE BOARD OF CHILDREN'S GUARDIANS, DEFENDANTS.

Argued June 29, 1920—Decided October 26, 1920.

1. The theory of a chattel ownership in a child is not capable of legal recognition. The right of the parent to the custody of the child subsists so long, and only so long, as the parent performs the duty of care and maintenance imposed upon the parent by law.

2. The state has a duty as *parens patriæ* of children within its jurisdiction, not only in the interest of the child, but also in the interest of the state itself, representing the people, whose future morals and prosperity and quality of citizenship it develops, and when the parent neglects the duties which he or she owes to the child, the state may take away the custody of the child from the parent.

3. Where an abandoned child had been legally committed by a magistrate, on the application of an overseer of the poor, to the care and custody of the state board of children's guardians, the Orphans' Court, upon application for the purpose, and upon notice to the state board, but without notice to the mother, was possessed of the necessary jurisdiction to make an order for the adoption of the child.

On *habeas corpus*.

Before Mr. Justice MINTURN.

For the petitioners, *Weinberger & Weinberger (Francis H. McGee,* representing the attorney-general for the state board).

For the other defendants, *Ranzenhofer & Ranzenhofer.*

The opinion of the court was delivered by

MINTURN, J. After Barbara Fischer, one of these petitioners, the natural mother of the child in controversy, had been committed to the county jail of Passaic county, by a police

magistrate of the city of Passaic, on the 16th of March, 1916, for the offence of cruel and inhuman treatment of her child, the latter an infant five years of age, was thereafter, on April 1st, 1916, legally committed by the same magistrate on the application of the overseer of the poor, as an abandoned child, to the care and custody of the state board of children's guardians. Upon an application for that purpose, the Orphans' Court thereafter, on August 9th, 1917, upon notice to the state board, but without notice to the mother, made an order allowing these defendants, Mr. and Mrs. Meader, to adopt the child, and as a result thereof the child has assumed the family name of the Meaders, and has ever since remained the only child of their household. The mother for some time had been an enforced habitue of the police court, and the child, so far as her paternity was concerned, was *filius nullius.* Whatever legal status John Fischer, the putative father, and the other petitioner herein, may have enjoyed under the civil law by reason of his recent marriage to the mother, he occupied no recognized legal paternal status at common law or under our statute. 2 *Kent Com.* 218, 331; *Pamph. L.* 1913, *p.* 733.

Over four years have elapsed since the child became by the act of its mother and the declaration of the police court a practical derelict and a waif. In the language of the civil law she was *filius populi;* and in the terms of our statute she was an abandoned child. During that interim and until shortly prior to this application the maternal instinct never asserted itself sufficiently to manifest the least concern, interest or feeling of responsibility in or for the welfare of its progeny. That fact upon this application is important only to emphasize the fact and the completeness of the abandonment. That the child was abandoned was held to be the fact by the police court and by the proceedings of the overseer, as a result of which proceedings she was surrendered into the custody of the state board. An inspection of those proceedings satisfies me of their legal correctness. But aside from that aspect of the situation this petitioner cannot in this proceeding attack a collateral adjudication of a tribunal of competent jurisdiction, which determined the legal status of the infant as that

of an abandoned child, and the specific and continued dereliction of the mother as evidence of that abandonment. In legal effect, therefore, the child became a public charge and a ward of the state as *parens patriæ. In re Marlow,* 75 *N. J. L.* 400; *State* v. *Heller,* 63 *Id.* 105; 15 *Am. & Eng. Encycl. L.* 144, and cases.

The fundamental contention is, that the mother not having received notice of the proceedings in the Orphans' Court for the adoption of the child, those proceedings are without legal warrant. The proceedings are statutory, and the Adoption act requires notice to the parents, or to one of them, under certain circumstances. That legislation was supplemented by what is popularly known as the "Childs Welfare act," by which the state exercising its undoubted power as *parens patriæ* created what is known as a "State Board of Children's Guardians." *Pamph. L.* 1899, *p.* 362; *Comp. Stat., p.* 2819. The title of the act is sufficiently comprehensive to indicate its purpose, for it expressly creates the board to exercise "maintenance, care and general supervision over indigent, helpless, dependent, abandoned, friendless and poor children, now or hereafter to become public charges of this state."

The eighth section provides that upon commitment of a child as a "public charge" by the overseer of the poor of any municipality, and upon notice thereof to the state board, "such child or children shall immediately become the ward or wards of the state board of children's guardians; and said state board of children's guardians shall thereupon, for all intents and purposes, become and be declared the legal guardian of such child and entitled to its custody; and which right of guardianship shall supersede any right of the parents of said child so far as its custody is concerned."

The final section of the act provides that it shall be liberally construed "for the benefit of any child or children so becoming ward or wards of such board of children's guardians as aforesaid." The status of the board having been thus expressly fixed "for all intents and purposes" as the "legal guardian" of the child in question, and it being conceded that the board received notice of the application for adoption, the

legal conclusion follows that the Orphans' Court was possessed of the necessary jurisdiction to make the order in question.

The more radical attack, however, is made upon the act itself, in that, as alleged, it deprives the mother of the constitutional right of possessing her child, thus contravening the inhibition of the fourteenth amendment to the federal constitution, requiring "due process" as a condition precedent to the deprivation of a vested right. It may be said *in limine* that it is difficult to apprehend any existing legal right where such right has been abandoned by the party possessing it. The assertion of the right assumes its existence when in fact the decree of the court is proof of its abandonment. When this petitioner abandoned her child it became a public charge, and it became the duty of the state as *parens patriæ* to claim it, not only in the interest of the child, but also in the interest of the state itself, representing the people whose future morals and prosperity depend essentially upon the character and quality of the citizenship it develops.

The claim of the petitioner is based upon the theory of a chattel ownership of the child, but no such right is capable of legal recognition. The right of the parent to the custody of the child subsists so long, and so long only, as the parent performs the duty of care and maintenance imposed upon her by law. This natural and legal duty is the correlative of the corresponding right of custody; for, as stated by Dr. Paley in his "Moral Philosophy" (*book 1, p.* 221) : "The rights of parents result from their duties. This relation confers no property in their persons or natural dominion over them."

To the same effect is Chancellor Kent, who says, "The rights of parents result from their duties. This is the true foundation of parental power." 2 *Kent Com.* 203.

Where the performance of those duties is consistently neglected, the public safety becomes *pro tanto* endangered by the creation of a public burden which, as the same learned Chancellor truly observes, may eventuate "in such children becoming a public nuisance." *Ibid.* 196. *Salus populi suprema lex* is the controlling maxim of all civilized governments in such

a situation; and no government can be said to be secure in its future development, which fails in its duty to its human derelicts and its prospective citizens by failing to properly maintain, develop and educate them.

Speaking upon this subject an eminent Irish jurist, in *In re Moore,* 11 *Ir. C. L.* 1, says:

"The dominion which a parent has over a child is a qualified one and given for the discharge of important trusts. He will be secured in it so long as, and no longer, than he discharges the correlative duties; and a failure in them, under circumstances and to an extent to bring on him the brand of unfitness, amounts to a forfeiture of his right and warrants the interposition of the proper legal tribunal for the protection of the child, by wresting from the parent the trust which he has abused, or which the court plainly sees he is unable or unwilling to perform. The right to the custody and services of the child, and the obligation to support and educate, are reciprocal rights and obligations; they are dependent upon each other; they do not exist apart." To the same effect, see *Mercein* v. *People,* 25 *Wend.* 64.

While the question of the constitutionality of such legislation is *res nova* in this state, the highest courts in sister jurisdictions have sustained it. Thus, in *Purinton* v. *Jamrock,* 195 *Mass.* 187; 80 *N. E. Rep.* 802, the Supreme Court of that state held that "parents have no right of property in their minor children of which they cannot be deprived without their consent;" and also that "the state may properly dispense with a mother's consent to the adoption of her child by another where it was taken from her, because of her misconduct, and she has for several years permitted it to be supported as a pauper by the state."

To the same effect are *Stearns* v. *Allen,* 183 *Mass.* 404; 67 *N. E. Rep.* 349; *In re Edds,* 137 *Mass.* 346; *In re Camp,* 131 *Cal.* 469; *Egoff* v. *Madison Co.,* 170 *Ind.* 238; *Tiffany* v. *Wright,* 79 *Neb.* 10; *In re Larsen,* 31 *Hun* (*N. Y.*) 539; *Parsons* v. *Parsons,* 101 *Wis.* 76; *Nugent* v. *Powell,* 4 *Wyo.* 173; 20 *R. C. L.* 597, and cases.

Many cases place this inherent prerogative of the state to intervene as *parens patriæ* as done in the interest of the child, whose distinctive personal interests in such a status may be considered apart from those of the parent. But, as I conceive it, the true and philosophic ground for state interference is based upon the reason underlying the maxim to which I have adverted, and which in its essence concerns the future stability, the intellectual and moral progress of the state itself, representing the substantial and highest interests of the people. Whatever may be true of other forms of government, a democracy can subsist only upon the proper education, development and morality of its people, for it is as true to-day as it was when Aristotle declared it as an axiom of his "Politics," that "the best laws, though sanctioned by every citizen of the state, will be of no avail unless the young are trained by habit and education in the spirit of the constitution."

All so-called rights of parents and individual interests must succumb to this consideration; and when the child, as in this instance, becomes a derelict and a waif, the power and necessity of self-preservation demands the intervention of the state for its own safety. But whatever the rationale of the prerogative the right and duty of the state to interfere is indubitable. 20 *R. C. L.* 599, and cases.

The case of *In re Hoines,* 112 *Atl. Rep.* 613, recently determined by Vice Chancellor Stevenson, has been called to my attention, as possessing some bearing upon this moral and fundamental right. No such question was presented there as we are concerned with here. It is worthy of note, however, that the learned Vice Chancellor accords to the statute under consideration the same construction which I have given it, which concedes to the state board the status of legal guardian of the children placed in its charge. The learned Vice Chancellor was dealing with the case of two children under five years of age, who at all times when not in the mother's custody were in the custody of the state board, not by reason of the parents' abandonment, but on account of the parents' poverty. The mother was characterized by the learned Vice

Chancellor as an "industrious, capable woman, whose tender affection for her children and ability and *bona fide* desire and intention to bring them up properly has not been called in question." The record here presents no such laudable qualities as characteristic of this petitioner; but rather a situation emphasizing their complete antithesis; and, upon this record evincing dissipation, cruelty and abandonment, the state intervened *pro bono publico* as the child's guardian, resulting in the proceeding of adoption here presented for review, in which for the reasons stated no illegality can be observed.

The writ will therefore be dismissed.