IN RE ARONSON: FINLEY and another, Appellants, vs. NELTON, Guardian *ad litem,* Respondent.

*March 30—May 5, 1953.*

For the appellants there was a brief by *Doar & Knowles* of New Richmond, and oral argument by *John Doar*.

For the respondent there was a brief by the *Attorney General* and *Warren H. Resh*, assistant attorney general, and *George W. Peterson*, district attorney of Polk county, and *E. Nelton* of Balsam Lake, guardian *ad litem* for Patrick Aronson, and oral argument by *Mr. Resh*.

CURRIE, J. In order to determine whether Ruth Finley and Donald Finley possessed the right to appeal from the

final order of the juvenile court it is necessary to analyze the statutes, under which the proceedings in juvenile court were instituted and carried on, as well as the particular subsection conferring the right of appeal. This is so because sub. (8) of sec. 48.07, Stats., provides for the taking of an appeal without specifying who may do so.

The statute governing the institution of the proceedings is sec. 48.06 (1), Stats., and provides that which the petition must contain, and among other things requires that it must allege "the facts which bring said child within the definitions of a neglected, dependent, or delinquent child." After the petition has been filed sec. 48.06 (2) requires the court to summon "the person or persons who have the custody or control of the child to appear personally and bring the child" to court. If such person, or persons, are not the parent or guardian, then notice of the hearing must be given to "the parent or guardian, or both" at least twenty-four hours before the hearing and summons may be issued for their appearance. It is further provided that no summons need be issued for either the person having custody, or the parent or guardian, if such persons "shall voluntarily appear." Thus the person who has the custody of the child is not only a proper, but also a necessary, party to the proceedings whether or not he or she be the parent or guardian.

When we speak of a person being a party to proceedings instituted pursuant to sec. 48.06, Stats., we do not mean adversary party in the sense of the ordinary lawsuit in which there are a plaintiff and a defendant. As pointed out in *In re Fish* (1945), 246 Wis. 474, 17 N. W. (2d) 558, such proceedings are in the nature of a judicial investigation without adversary parties. However, a person having custody of the child, or a parent or guardian of such child, is a party in such proceedings in the sense that he or she has the right to appear and give testimony, to be represented by counsel, to call witnesses, and to cross-examine witnesses.

Sec. 48.07 (7) (a), Stats., confers the power upon the juvenile court in such proceedings to transfer the permanent care, control, and custody of the child and to terminate all parental rights. Sec. 48.07 (7) (am), however, provides that the juvenile court shall only order the "transfer of the permanent care, control, or custody of a child or termination of the rights of the parents with reference to a child" after a hearing as to which personal notice shall have been given to the "parents of such child" at least ten days prior to the date of such hearing. If personal service cannot be obtained, then notice is to be given by three weeks' publication. However, this subsection does not provide for the filing of any new petition but is only an additional step in the original proceedings instituted by the filing of the original petition.

Sec. 48.07 (8), Stats., confers a right of appeal from the final order of the juvenile court, which subsection provides in part as follows:

"In any case where a child is found, determined, or adjudged by the juvenile court to be dependent, neglected, or delinquent or in case of the transfer of the permanent control, care, and custody of a child or the termination of the rights of a parent or the parents with reference to such child, appeal may be taken to the circuit court of the same county or if the circuit judge is the judge of the juvenile court, or in the children's court of a county having a population of 500,000 or more, directly to the supreme court."

As previously mentioned herein, the foregoing subsection is entirely silent as to who may exercise the right of appeal therein authorized. In passing on whether Ruth Finley had the right to appeal from the order made by the juvenile court the question arises as to whether the person having custody of the child at the institution of the proceedings, and who is a necessary party thereto, has such right of appeal irrespective of whether such person is a parent.

There probably are few, if any, communities in the state in which one or more children are not living and being

brought up in the home of some relative, such as a grandparent, aunt, uncle, or older brother or sister. This may have resulted from the death of one or both parents, or the breaking up of the parental home by divorce, imprisonment for crime, or commitment for insanity. Undoubtedly there are also other causes for relatives taking children into their homes and caring for them beyond those enumerated. We cannot conceive that the legislature would intend in such cases that, if the permanent custody of such children be permanently transferred by an order of the juvenile court to the state department of public welfare, such relative having the prior custody of the child would have no right of appeal under sec. 48.07 (8), Stats. To permit a parent alone to appeal, in these cases of a child residing with a relative, would from a practical standpoint be to deny any appeal at all in many cases due to the death, insanity, imprisonment, residence in a distant foreign land, etc., of the parents.

While the interest of the child is of paramount consideration in construing these statutes, we fail to see how the welfare of the child would be adversely affected by holding that the person having the prior custody, as well as a parent, should possess the right of appeal. This is especially so in the light of the provision in sec. 48.07 (8), Stats., which provides that the courts may only stay, pending the appeal, the carrying out of the juvenile court order transferring permanent custody upon the condition of "the giving of a suitable bond for the care and maintenance of such child in wholesome and proper surroundings to be approved by the court." For these reasons it is our considered opinion that the person having the custody of the child at the time of the institution of the proceedings under sec. 48.06, Stats., as well as a parent, has the right to appeal under sec. 48.07 (8) from an order of the juvenile court transferring the permanent custody of the child. The legislature, in providing that all persons having the custody or control of the child must be

summoned to appear, if they do not voluntarily appear in the proceedings, did not distinguish between relatives and non-relatives. Therefore, inasmuch as Ruth Finley had the custody of Patrick Finley at the time of the institution of the proceedings in juvenile court, and she appeared therein in person and by attorney, we hold that she was entitled to appeal from that part of the final order of the juvenile court transferring permanent custody irrespective of whether she is, or is not, a relative of Patrick Finley.

The original petition by Henrietta Sievert alleged that Ruth Finley had the care, custody, and control of the child and the final order of the juvenile court contained a finding that this was so. The appellant Donald Finley has not challenged such finding. Therefore, unless the evidence in the record establishes that Donald Finley is the father of Patrick Finley, he obviously would have no interest in the proceedings in juvenile court which would entitle him to appeal from the final order made by such court.

The juvenile court made a definite finding of fact that the evidence did not prove beyond a reasonable doubt that one Clarence Aronson could not be the father of the child and specifically found said Clarence Aronson to be the father. Such finding is challenged by the appellant Donald Finley. In order to pass on such finding, it is necessary to review the testimony given on this issue at some length.

Clarence Aronson and Chloris Aronson were married in 1939. In the summer of 1942 they were residing together as husband and wife at Amery, Wisconsin. Chloris Aronson testified that Clarence Aronson left her in such home in the middle of August, 1942, ostensibly to visit a sister, and that she did not see him again until sometime in 1944. The second day after Labor Day (which would be September 9, 1942) she went to St. Paul, Minnesota, in company with Donald Finley and there resided with Finley until sometime in 1944, and they there held themselves out to be husband

and wife. The child, Patrick, was born July 19, 1943, at St. Paul, and when he was about ten months old Chloris Aronson turned the custody of the child over to Ruth Finley (mother of Donald) and said child has resided in the home of Ruth Finley continuously from then until the institution of the proceedings in juvenile court. Chloris Aronson testified positively that Donald Finley was the father of the child.

Clarence Aronson was called as a witness and his testimony fully corroborated that of Chloris Aronson, except that he ventured no opinion as to who was the father of the child, but made no claim that he was such father. He testified that he had left his home at Amery, in which he had been residing with his wife, sometime in the summer of 1942 and went to Durand, Wisconsin, where he was employed. He fixed the date of such leaving as "after July, sometime in the summer" and stated that he was gone three weeks or a month, and came back to his home at Amery and then found that his wife was gone, and did not see her until sometime in 1944. He was not able to fix the date of his return any more definitely than to state that it was "towards fall."

Donald Finley acknowledged in his testimony that he definitely was the father of the child.

The evidence thus establishes that the last date on which Clarence Aronson and Chloris Aronson cohabited together as husband and wife, prior to the birth of the child, was the "middle of August," 1942. The phrase "middle of August" is rather a flexible one and might well cover any date from August 10th through August 20th. If August 20th be accepted as the last date of cohabitation, a period of three hundred thirty-two days elapsed from the date of such cohabitation until the birth of the child on July 19, 1943. Under no reasonable interpretation of the testimony of either Chloris Aronson or Clarence Aronson could such last date of cohabitation have been later than August 31st, and if

August 31st were to be taken as the last date of cohabitation, a period of three hundred twenty-one days would have elapsed between such date and the birth of the child.

At common law there is a rebuttable presumption of legitimacy of a child born during wedlock. 7 Am. Jur., Bastards, p. 655, sec. 43. In keeping with this presumption, Wisconsin enacted sec. 328.39 (1), Stats., reading in part as follows:

"Whenever it is established in an action or proceeding that a child was born to a woman while she was the lawful wife of a specified man, any party asserting the illegitimacy of the child in such action or proceeding shall have the burden of proving beyond all reasonable doubt that the husband was not the father of the child. In all such actions or proceedings the husband and the wife are competent to testify as witnesses to the facts."

The courts of a number of other jurisdictions have by court decision, in connection with applying the common-law presumption of legitimacy as to a child born during wedlock, adopted the same rule that is embodied in sec. 328.39 (1), Stats. See annotation entitled "Degree of proof necessary to overcome presumption of legitimacy," 128 A. L. R. 713, 717.

In the following cases it was held that a period of nonaccess of three hundred four days or more on the part of the husband was sufficient to establish under the facts of those cases that a child born to the wife was not the child of the husband. *Estate of McNamara* (1919), 181 Cal. 82, 183 Pac. 552, 7 A. L. R. 313 (period of nonaccess three hundred four days); *Commonwealth v. Kitchen* (1937), 299 Mass. 7, 11 N. E. (2d) 482 (period of nonaccess three hundred five days); and *Boudinier v. Boudinier* (1947), 240 Mo. App. 278, 203 S. W. (2d) 89 (period of nonaccess three hundred sixteen days). In the first two of such three cases the courts employed the "beyond a reasonable doubt" degree of proof test to rebut the presumption of legitimacy.

The decision in *Estate of McNamara, supra,* reviews the results of research made by medical authorities on the question and states (p. 90) : ". . . a reading of these same authorities makes it plain that *any period in excess of three hundred days is quite exceptional and that with each day over three hundred the exceptional character of the case is much intensified."*

The decision in the *Estate of·McNamara, supra,* was cited with approval by this court in *Gillis v. State* (1931), 206 Wis. 150, 152, 283 N. W. 804. The opinion of the Massachusetts court in *Commonwealth v. Kitchen, supra,* emphasized not only the long period of nonaccess by the husband, but also the fact that the evidence disclosed that during the inception of the normal period of gestation the mother of the child was cohabiting with a man other than her husband, and held that such latter fact distinguished the case from that of *Pierson v. Pierson,* 124 Wash. 319, 214 Pac. 159, in which latter case there was no evidence that the mother had sexual intercourse with any man other than her husband prior to the birth of the child.

This court is in entire sympathy with the purpose underlying the enactment of sec. 328.39 (1), Stats., of requiring the highest degree of proof known to our law, that of proving beyond a reasonable doubt that the husband is not the father of a child born to a woman in wedlock, in order to establish the illegitimacy of such a child. The conscience of society requires that an innocent child should not be branded with the social stigma of being illegitimate with any degree of proof less than that. However, when the evidence in such a case does establish beyond a reasonable doubt that the husband is not the father, it is the duty of the court to so find. In the instant case the finding, that it was not proved beyond a reasonable doubt that Clarence Aronson was not the father of the child, might possibly be upheld, even though the last possible date of intercourse between him and Chloris Aron-

son had occurred at least three hundred twenty-one days before the birth of the child, if the other evidence in the case did not disclose intercourse with another man during the normal period of gestation. This is because of the rare cases known to medical science of the few births which have occurred beyond a period of gestation of three hundred twenty days. However, we have the additional fact present here that Chloris Aronson was cohabiting with Donald Finley during the inception of, and throughout, the normal gestation period. This coupled with the known nonaccess of the husband for at least three hundred twenty-one days, establishes beyond a reasonable doubt that Clarence Aronson is not the father of the child. This same evidence together with the testimony of both Chloris Aronson and Donald Finley, that the latter was the father, clearly establishes the paternity of Donald Finley.

The learned circuit judge in part relied upon 30 Op. Atty. Gen. 282, in holding that Donald Finley had no right of appeal even though he were the putative father. Such opinion of the attorney general was rendered in 1941, and the question passed upon was whether notice of proceedings to terminate parental rights and transfer permanent custody of a child was required to be given to the putative father of an illegitimate child under the provisions of sec. 48.07 (7) (a), Stats. 1941, the provisions of which subsection approximate those of sec. 48.07 (7) (am), Stats. 1951. The attorney general ruled therein that no such notice was required to be given to a putative father. The gist of such opinion appears in the following statement contained therein (p. 285):

"An analysis of the various cases discloses that the courts are inclined to hold that the father of an illegitimate child is a 'parent' whenever such a construction would result in a benefit to the child but hold the contrary where such construction would be detrimental to the child. Since it would be detrimental to the child to require notice to his father of proceedings under sec. 48.07 (7) and might upset many

such proceedings which have been conducted in the past without notice to the putative father, it seems likely that the courts would construe the word 'parent' as used in sec. 48.07 (7) (a) as not including the putative father."

7 C. J., Bastards, p. 955, sec. 29, and 10 C. J. S., Bastards, p. 83, sec. 17, lay down the general rule at common law that a putative father of an illegitimate child has, in general, the right to custody of such child against all but the mother. These same authorities are cited in 30 Op. Atty. Gen. 282, 284, but the attorney general expresses the opinion that the Wisconsin statutes on child protection, embodied in ch. 48, have changed this common-law rule.

We concur in the opinion of the attorney general that no summons or notice is required to be given to a putative father not having custody of the child under either sec. 48.06 (2) or sec. 48.07 (7) (am), Stats., because to require such notice might in some instances be inimical to the best interests of the child, and the child's rights are paramount. On the other hand, where such putative father appears in the proceedings and acknowledges in open court that he is the father, and the evidence so establishes such fact, we cannot perceive how the best interests of the child would be adversely affected by then recognizing the common-law rights of such father, and we so hold. Therefore, Donald Finley, as such proper party, had the right to appeal from the order of the juvenile court as authorized by sec. 48.07 (8).

Donald Finley's admission in open court that he is the father of Patrick established Patrick's right under sec. 237.06, Stats., to inherit from Donald. Because of this, and the common-law right of a putative father to custody, we believe that the demands of justice would best be served by our holding that a putative father, who voluntarily appears in the juvenile court proceedings, is a proper party thereto possessing a right of appeal, even though the proceedings are not

jurisdictionally defective if he has not been notified thereof either by personal service or publication.

Counsel for appellants state they are fearful that in the new trial to be had in circuit court the state will attempt to establish that Patrick Finley is a "neglected child" within the meaning of that part of the definition of sec. 48.01 (1) (a), Stats., which states that if a child *"is in a home, other than his own, to which the state department of public welfare has refused or is refusing to issue a foster-home permit"* he is a *"neglected child."* This seems to us to be a groundless apprehension. In order to properly construe the reference to a foster-home permit in sec. 48.01 (1) (a), it is necessary to turn to sec. 48.38, which defines the term "foster home" and specifically excludes cases where a child resides with a relative, or where a "natural or adoptive" parent resides in the home with the child. For the purposes of sec. 48.38 we would deem a putative father, who acknowledges that he is the father of his child with whom he resides in the same house, to be the "natural" parent of such child.

*By the Court.*—Order reversed and cause remanded for further proceedings consistent with this opinion.