In re Aronson: Aronson and others, Appellants, vs.
Sievert and others, Respondents.*

*March 9—April 5, 1955.*

* Motion for rehearing denied, with $25 costs, on June 1, 1955.

462

Ruth and Donald .Finley and Chloris Aronson have appealed from such judgment to this court. Further facts will be.stated in the opinion.

For the appellants there were briefs by *Doar & Knowles* of New Richmond, and oral argument by *John Doar.*

For the respondents there was a brief by the *Attorney General* and *Warren H. Resh,* assistant attorney general, and *George W. Peterson,* district attorney of Polk county, and *E. Nelton* of Balsam Lake, guardian *ad litem,* and oral argument by *Mr. Resh* and *Mr. Nelton.*

CURRIE, J.   The child Patrick was brought to the home of Mrs. Ruth Finley at Clear Lake in Polk county when he was approximately six to ten .months old and remained in her custody until on or about November 2, 1951, when removed therefrom at the time of the commencement of the instant proceedings, at which time Patrick was then eight

years of age. Mrs. Finley's son, Donald, resided in such home also off and on when he was not working. Since November 2, 1951, Patrick has resided in the home of Mr. and Mrs. James Moore at Balsam Lake where he was placed by the department of welfare. The Moores have a permit or license to operate a foster home as prescribed by sec. 48.38, Stats., and at the time of trial Mr. Moore was the sheriff of Polk county.

Miss Henrietta Sievert, the children's worker of the county department of welfare who instituted the proceedings, observed conditions in the Ruth Finley home on November 2, 1951, as follows: The home which consisted of four rooms was dirty and "unkept" with ashes from the coal or wood heater scattered over the living-room floor. Patrick was sitting in the middle of a bed in the living room dressed in dirty underwear and red anklets, the heels of which were coming out, and he was frail, thin, and underweight. Patrick's skin was dirty and his hair needed cutting. When Mrs. Finley dressed him so that Miss Sievert might take him with her, the clothing in which he was then dressed was also dirty. Four or five days later Miss Sievert called at the Moore home to check on Patrick and found him happy there and he said to Miss Sievert, "don't take me back."

Mrs. Moore testified that when Patrick first came to their home both his person and clothing were dirty, and that he had no training in many things, such as the use of toilet paper, and that his table manners were not good.

Two neighbors of Mrs. Finley testified that the latter's home was poorly kept and dirty.

On the other hand, Dr. Campbell, the Finley family physician who had treated Patrick professionally for the three years preceding November, 1951, and who had been in the home many times, testified that Patrick's health was relatively good, that the house was old but warm, that the walls were dirty but that there was no garbage lying around or

outlying filth. He further testified that Patrick was always warmly dressed, although the clothing was poor but not filthy.

Dr. Nelson, a retired physician residing in Clear Lake, but who had not treated Patrick professionally since 1947, testified that during the period of 1947–1951 he had seen Patrick a number of times and that his clothing was reasonably clean, that his skin, head, and hands were clean, that he looked fairly strong, and that he smiled and played like other youngsters would do.

Miss Levin, who was Patrick's third-grade teacher in the public school at Clear Lake in the fall of 1951, testified that Patrick only missed four and one-half days of school up to November 2d of that year, and that he was dressed in jeans and little shirts like average children, there being nothing unusual about his clothing. She further stated that his school work was average or satisfactory.

Mrs. Finley testified as follows: She would be seventy years of age in September, 1954; she was in good health except for arthritis in her hands and one knee; that she was able to do her housework including preparing meals, washing and ironing, and did clean the house periodically. She was dependent for her support upon old-age assistance (often referred to as old-age pension) and that which Donald contributed. She provided Patrick with the best clothes she could get, including warm clothes for winter and saw to it that he had a proper diet including fruit, cereal, and vegetables. Photographs of the interior of her home were received in evidence and she stated that they showed conditions about as they were when Patrick resided in the home. There is nothing in these pictures to indicate anything inadequate in the furnishings or lack of neatness or cleanliness.

There was much testimony adduced as to Donald Finley's addiction to the use of intoxicating liquor and of quarrels that had taken place between his mother and him over it. The

village police officer of Clear Lake testified that he had been called to the Finley home in the fall of 1949 and again in the midsummer of 1950 because Donald was intoxicated and Mrs. Finley claimed Donald was abusing her. On the first occasion he placed Donald in jail. The police officer also stated that Donald was on the "black list." On the other hand, both Donald and his mother testified that his drinking habits had improved before November 2, 1951. Mrs. Finley testified that Donald was always very kind to Patrick.

The learned trial judge questioned Patrick in the absence of the jury, but in the presence of counsel, for the purpose of determining whether the boy should be permitted to testify and a ruling was then made against him so testifying. Patrick stated that Mrs. Finley had given him "pretty good care," but that the care given him by Donald Finley was "not too good." He also stated that he had not gone to church or Sunday school very often before coming to live with the Moores, but since then had been going to Sunday school.

Chloris Aronson, the mother of Patrick, testified that the reason she gave up his custody to Mrs. Finley when the child was a baby was because she had epilepsy and could not care for him. She stated for the past six years before the trial she had been unable to work and had been living with her mother at Spring Valley. She had shown enough interest in Patrick to make several trips up to Clear Lake to visit him, but there is no evidence that she had contributed anything to his support.

Based upon the foregoing summary of the evidence, excluding the statements made by Patrick in the absence of the jury, we have no hesitation in holding that there was sufficient credible evidence to support the jury's answers in the special verdict that Patrick was neglected by Chloris Aronson, Donald Finley, and Ruth Finley on or about October and November, 1951.

While appellants' brief does advance the contention that the evidence did not sustain the jury's findings as to neglect, the principal errors assigned therein are:

(1) It was error to submit the paternity issue to the jury in view of the holding of this court on such issue in *In re Aronson* (1953), 263 Wis. 604, 58 N. W. (2d) 553.

(2) It was error to permit the same jury to decide the issue of paternity before whom was tried the issue of whether Patrick was a neglected child.

(3) The trial court committed error in its rulings on evidence.

The proceedings in the trial court in this matter were held pursuant to the provisions of sec. 48.07, Stats. We are convinced from a careful analysis of the provisions of such statute that the trial of an issue as to the legitimacy or illegitimacy of the infant, whose status as an alleged "neglected child" is the subject of the judicial inquiry, has no place in such proceedings. Even though the petition seeks to terminate parental rights as well as to have the infant adjudged a "neglected child" the statute does not require the issue of parentage or legitimacy to be litigated.

In our former opinion (263 Wis. 604, 616) we held that the best interests of the child are paramount in a situation where the same conflict with the rights of a putative father, and because of this no notice is required to be served upon the putative father of the institution of the statutory proceedings to have an infant adjudged a "neglected child" and for termination of parental rights. We further held, however, that where the putative father appeared in the proceedings and acknowledged that he was the father of the child, the best interests of the child did not require that the putative father be denied the right to appeal to circuit court from the determination made by the juvenile court. However, we regret that we did not go one step further in our former opin-

ion and state therein that if in either juvenile court, or in the appeal proceedings in circuit court, it should be found that the infant was a neglected child and that parental rights should be terminated, it would not be necessary to recognize the claimed rights of the putative father as "parental rights" within the meaning of sec. 48.07 (7), Stats., so as to require the termination thereof in the order or judgment. We do now hold the foregoing to be the proper construction to be placed upon such statute.

A reading of the record on this appeal of the testimony given before the jury on the issue of the paternity of Patrick has strongly impressed us that the litigation of such issue was highly inimical to his best interests. Unlike the proceedings in juvenile court, this was a public trial in open court in the village in which he was living and attending school. The learned trial court interpreted our prior opinion on the former appeal as requiring the submission of the parentage issue to the jury. There is an old adage that "hindsight is always better than foresight," which is most apropos here. If, at the time of writing our original opinion, we could have foreseen what was to transpire at the new trial on appeal, we would have limited our conclusion with respect to the parentage issue by stating that the same was solely applicable to Donald Finley's right of appeal. In addition we would have declared that Patrick's status in so far as the legitimacy of his birth was concerned was not an issue to be litigated in this type of proceeding.

The point raised on this appeal, which has caused this court the most difficulty, is whether the evidence admitted on the parentage issue may have so prejudiced the jury as to have influenced their answers to the remaining questions of the verdict relating to the neglect issue as to necessitate a new trial. Much evidence was admitted establishing acts of adultery between Donald Finley and Chloris Aronson, and

not only may well have prejudiced the jury against Donald Finley and Chloris Aronson, but also may have influenced the jury in finding that Ruth Finley had neglected Patrick. As to this last-mentioned result, the jury might have concluded upon such testimony that, inasmuch as Donald intermittently resided in the same home with his mother and Patrick, such home was not a fit place for Patrick to reside because of Donald's prior misconduct with Chloris Aronson. At the commencement of the trial, after objection of appellants' counsel that the issue of paternity be not tried had been overruled, such counsel and the guardian *ad litem* for Patrick were willing to stipulate that the issue of legitimacy be tried by the court and not the jury after the jury had passed upon the issue of neglect. The district attorney refused to so stipulate on the ground that he thought the misconduct between Donald Finley and Chloris Aronson should be brought out in evidence before the jury on the issue of neglect. There, therefore, is no doubt but that the district attorney thought such evidence might influence the jury in deciding the neglect issue.

The acts of adultery between Donald Finley and Chloris Aronson terminated when they ceased living together in 1944, over seven years prior to October and November, 1951, when the acts constituting neglect of Patrick are alleged to have taken place. If only the neglect issue were being litigated before the jury, an objection as to relevancy of such evidence would be properly sustainable on the ground of being too remote in point of time. Donald's acts of drunkenness, on the other hand, were so close in point of time to October and November, 1951, as to be properly admissible.

However, as pointed out in our prior opinion on appeal, this proceeding is in the nature of a judicial inquiry, which differs materially from the ordinary action between adverse parties. Error occurring in the trial, which would be of such character as to be prejudicial and necessitate a new

trial in the ordinary adversary action, may not necessarily require such a result in the proceeding like that now before us. Such an inquiry is concerned with the issue of whether Patrick was a "neglected child" in October and November, 1951, requiring change of his custody and termination of parental rights, and his welfare is paramount to any parental or custodial rights involved. More than three years have now elapsed since he was removed from the Ruth Finley home and placed in the Moore foster home in another community during which period he has made the adjustments incidental to change of home and school, including making an entirely new circle of childhood associates. If this court were to decide, as the original trier of fact, the issue of whether Patrick was a neglected child on November 2, 1951, based upon the record of the testimony before us, and excluding therefrom any improperly received evidence, we would determine that the weight of the evidence supports the determination that Patrick was a neglected child. In making such statement we do not intend any disparagement of Ruth Finley. The testimony discloses beyond dispute that she had a great affection for Patrick. She probably did what lay within her power to provide him with a good home and we believe any neglect on her part was due to her age and the crippling effects of arthritis.

In so far as Chloris Aronson and Donald Finley are concerned, the evidence is overwhelming as to their neglect of Patrick, and any rights they may have to have Patrick returned to the Ruth Finley home are negligible in comparison to Patrick's welfare. While the claim of Ruth Finley incites our sympathy it also must yield when weighed against Patrick's best interests.

As we view it, whether a new trial should be granted in this proceeding is dependent on whether we consider the error in trying the paternity issue before the jury in connection with the neglect issue was so prejudicial to his best

interests as to require a new trial. It is our considered judgment that Patrick's best interests not only do not require a new trial, but that such new trial might even be considered as prejudicial to his welfare.

We do not feel called upon to pass on the rulings made at the trial on admissibility of evidence, except to state that even if such rulings were erroneous and prejudicial to appellants, or any of them, we conclude Patrick's welfare would not be promoted by directing a new trial.

We have no hesitancy in concluding that the trial court's termination of the parental rights of Chloris Aronson was proper.

From that which has already been stated herein, it is apparent that no one has been prejudiced by the jury's finding that Donald Finley was not the father of Patrick. Indeed, the best interests and welfare of Patrick would best be served by not disturbing such finding. We, therefore, are not required to make any analysis of the evidence presented on this issue to determine whether such evidence, in light of the strong presumption in favor of legitimacy contained in sec. 328.39 (1), Stats., sustains such finding.

*By the Court.*—Judgment affirmed.