364 P.2d 1029

James N. THOMAS and Kathleen McMurtrey Thomas, Plaintiffs and Appellants,

v.

CHILDREN'S AID SOCIETY OF OGDEN, a corporation, Defendant and Respondent.

No. 9419.

Supreme Court of Utah.

Sept. 7, 1961.

3. Pratt v. Amalgamated Ass'n, 50 Utah 472, 167 P. 830.

**236**

D. H. Oliver, Salt Lake City, for appellant.

Young, Thatcher & Glasmann, Ogden, for respondent.

CALLISTER, Justice.

Plaintiffs sought a writ of habeas corpus to obtain custody of their infant daughter. Upon conclusion of a hearing thereon, the lower court denied their petition and plaintiffs appeal. Defendant cross-appeals from an order disallowing certain costs.

On April 13, 1959, Kathleen McMurtrey, a white girl of 24 years, gave birth to the female child in question. She was unwed

at the time, but it is conceded that the plaintiff James N. Thomas, colored, is the father. After her conception in July, 1958, Kathleen lived with Thomas in Ogden, Utah, until some time in the middle of December, 1958, when she went to Idaho to spend Christmas at the home of her parents. While there, the parents became aware of Kathleen's condition and insisted upon accompanying her back to Ogden. There they met Thomas and, concluding that marriage would not be a satisfactory solution to the problem, prevailed upon Kathleen to leave the apartment of Thomas. They took her to an obstetrician who recommended they consult with the defendant, a duly licensed child placement agency, which they did.

The defendant agency made arrangements for Kathleen to stay in a foster home in Brigham City, where she remained until she was delivered. The day following the birth, April 14, 1959, Kathleen executed and delivered to a representative of the defendant a release and consent to adoption.

After her release from the hospital, Kathleen returned to the home of her parents, where she remained for several weeks. Some time during the latter part of May, 1959, Kathleen left Idaho and returned to Ogden and resumed her previous relationship with Thomas. In the fore part of June of that year Kathleen and Thomas made a demand upon the defendant to re-turn the child. This demand was refused and the plaintiffs were advised that the child had been placed for adoption.

On June 18, 1959, the plaintiffs went to Malad, Idaho, just across the Utah boundary line, where they went through a marriage ceremony, although Thomas was still legally the husband of Anna Lou Davidson, whom he had married in 1956. The plaintiffs chose to be married in Idaho because of Utah's miscegenation statute.[1] They returned to Ogden shortly after the ceremony and again made demand upon defendant, and were again refused.

The plaintiffs did nothing further until they filed their petition for writ of habeas corpus on April 5, 1960, the day after an interlocutory decree, divorcing Thomas and Anna Lou Davidson, had been entered in Carbon County, Utah. Under Utah law this decree did not become final until July 4, 1960.

 Plaintiffs assail the validity of the release and consent, claiming it to be void because signed under duress and by coercion, and because Kathleen's signature was not properly acknowledged. Although plaintiffs have not set forth in their briefs facts to support the charge of duress and coercion, we have, nevertheless, carefully examined the record in regard thereto. This, because in cases of this nature a

---

1. 30–1–2, U.C.A.1953: "The following marriages are prohibited and declared void:

\* \* \* (5) Between a negro and a white person."

young, unmarried mother may be easy prey to undue influence and, therefore, the evidence must be carefully viewed to avoid the mother being unjustly deprived of her child.[2] After such careful review of the record, we conclude that the assertion of duress and coercion is not supported by the evidence. It appears that Kathleen voluntarily signed the document after having been thoroughly advised as to its legal effect and consequences by a representative of the defendant.

With regard to the acknowledgment, it is evidently plaintiffs' contention that it was not proper because Kathleen was not sworn and put under oath. This is without merit and none of the cases cited by plaintiffs support such a contention. Section 78–30–4, U.C.A.1953, which provides for acknowledgment of releases and consent in matters of this kind merely requires that they be "acknowledged before any officer authorized to take acknowledgments." In the instant case the representative of the defendant who obtained the release and consent was a notary public who was authorized to, and did, acknowledge Kathleen's signature.

Plaintiffs claim that the lower court erred in finding that the child was illegitimate. If the child is legitimate, as claimed by plaintiffs, then the consent of the father as well as the mother would be necessary to divest them of custody.[3] In support of this position plaintiffs cite several statutes [4] relating to the legitimacy of children which have no application to this case. The fundamental fallacy to their argument is that plaintiffs were never legally married. Their purported marriage in Idaho was void under the laws of that State [5] and of this State [6] because Thomas had a wife living at the time from whom he was not divorced. The purported marriage was void ab initio.[7] Therefore, the trial court correctly found that the child was

---

2. In re Adoption of D, 122 Utah 525, 252 P.2d 223.

3. 78–30–4, U.C.A.1953: "A legitimate child cannot be adopted without the consent of its parents, if. living, nor an illegitimate child without the consent of its mother, if living, except that consent is not necessary from a father or mother who has been judicially deprived of the custody of the child on account of cruelty, neglect or desertion; provided, that the district court may order the adoption of any child, without notice to or consent in court of the parent or parents thereof, whenever it shall appear that the parent or parents whose consent would otherwise be required have theretofore, in writing, acknowledged before any officer authorized to take acknowledgments, released his or her or their control or custody of such child to any agency licensed to receive children for placement or adoption under chapter 8 of Title 55, and such agency consents, in writing, to such adoption."

4. 30–1–3, 30–1–4, 77–60–14, and 78–30–12, U.C.A.1953.

5. Section 32–207, I.C.

6. 30–1–2(2), U.C.A.1953.

7. Sanders v. Ind. Com., 64 Utah 372, 230 P. 1026.

illegitimate at the time Kathleen executed the release and consent. Her consent was all that was required by the provisions of Section 78–30–4, U.C.A.1953.[8]

However, plaintiffs argue that if the statute requires only the consent of the mother of an illegitimate child, and not that of the father, it is unconstitutional because "it authorizes a private individual to deprive another individual of his natural, statutory, and constitutional rights without a hearing of any kind." This poses the question as to whether the rights of a father, if any he has, to his illegitimate child come within the purview of the due process clause and various other provisions of the State and Federal Constitutions. We think not.[9] The claim of the plaintiffs is based upon the theory of a chattel ownership of the child, but no such right is capable of legal recognition. The putative father of an illegitimate child occupies no recognized paternal status at common law or under our statutes.[10] The law does not recognize him at all, except that it will make him pay for the child's maintenance if it can find out who he is.[11] The only father it recognizes as having any rights is the father of a legitimate child.[12]

Having determined that the child here involved was illegitimate, that the release and consent was valid, that the consent of the father was not necessary, and that the purported marriage was void, it follows the trial court's decision must be sustained and we need not, therefore, concern ourselves with our miscegenation statute (30–1–2(5)), the constitutionality of which is questioned by plaintiffs.

We have considered the other errors assigned by plaintiffs and find them without merit.

With respect to the cross-appeal of the defendant, we have examined the items which the trial judge struck from the memorandum of costs amounting to $304.40.

The items consisted of expenses incurred in the taking of depositions and securing certified copies of a marriage license and a divorce decree. No question was made as to the good faith of defendant in incurring these costs and they appear to be reasonable. They should have been allowed as a matter of course.[13]

Judgment affirmed with instructions to reinstate the items of cost which were

8. See anno.: 51 A.L.R.2d 497.
9. State ex rel. Booth v. Robinson, 120 Ohio St. 91, 165 N.E. 574; Commonwealth ex rel. Goessler v. Bernstein, 149 Pa.Super. 29, 26 A.2d 213; Purinton v. Jamrock, 195 Mass. 187, 80 N.E. 802, 18 L.R.A.,N.S., 926.

10. Fischer v. Meader, 95 N.J.L. 59, 111 A. 503; In re Hardenbergh's Will, 144 Misc. 248, 258 N.Y.S. 651.
11. 77–60–1 et seq., U.C.A.1953.
12. Re M, 2 Q.B. 479, 3 Week.L.R. 320, 51 A.L.R.2d 488.
13. Rule 54(d) (1), U.R.C.P.

stricken from defendant's memorandum of costs. Costs awarded to defendant.

WADE, C. J., McDONOUGH and CROCKETT, JJ., and R. L. TUCKETT, District Judge, concur.

HENRIOD, J., does not participate herein.