STATE EX REL. LEWIS and another, Petitioners, v. LUTHER-
AN SOCIAL SERVICES OF WISCONSIN and UPPER MICHI-
GAN, Respondent.

*No. State 12. 1970. (Advanced to August Term, 1969.) Argued
June 4, 1970.—Decided July 1, 1970.*
(Also reported in 178 N. W. 2d 56.)

For the petitioner Jerry D. Rothstein there was a brief and oral argument by *William G. Rice* of Madison.

For the petitioner John Thomas Lewis there was a brief and oral argument by *Bruce C. O'Neill* of Milwaukee, guardian *ad litem*.

For the respondent there was a brief by *Hamilton & Mueller* of Dodgeville, and by *Ralph von Briesen* of Milwaukee, and oral argument by *Frank D. Hamilton*.

A brief amicus curiae was filed by *Robert W. Warren,* attorney general, and *Donald P. Johns,* assistant attorney general, for the state of Wisconsin.

A brief amicus curiae was filed by *Charne, Glassner, Tehan, Clancy & Taitelman* of Milwaukee, for the Children's Service Society of Wisconsin.

HANLEY, J.  The answer to the first question presented has its roots in English common law which, in its earliest form, held that illegitimate children were *nullius filius*—the children of no one.  They thus came within the doctrine of *filius populi,* which provided that their custody was in the hands of the parish.

All jurisdictions now recognize that the mother, if a suitable person, is the natural guardian of her illegitimate child and, therefore, has a legal right to its custody, care and control superior to that of the father or any other person, unless it is otherwise provided by statute.[1]  The need for maternal care is stressed as one of the primary reasons for this general rule.

---

[1] 10 Am. Jur. 2d, *Bastards,* p. 889, sec. 60.

It has always been recognized that the parents of legitimate, as well as illegitimate, children have no vested rights in their children requiring protection accorded to property rights.[2]

"It is generally recognized that although parents have the natural right to the control and custody of their children, such rights are not absolute, but are subject to the power of the state as parens patriae, and may be restricted and regulated by its appropriate action."[3]

The rights of a putative father in this jurisdiction have not been clearly delineated by statute or by case law. Several significant cases pertaining to this question, however, have come before this court.

The first such case was *Adoption of Morrison.*[4] There the mother and father of an illegitimate child were minors seventeen years of age. At the time the child was born neither had reached majority. Shortly, after the child's birth the mother signed a written consent to an adoption; and arrangements were made for such adoption. Less than one year following the signing of such consent, the young couple turned eighteen and were married. The natural mother then attempted to withdraw her consent and have the adoption proceedings terminated.

One of the questions thus presented to this court was whether the consent of an illegitimate father was necessary where the father had married the child's mother after the adoption proceedings had begun, but prior to the judgment of adoption. By sec. 322.04 (1), Stats. 1947, the legislature had provided that consent of an illegitimate father was not necessary to the adoption of the illegitimate child. Since the child had been with the prospective parents for over three years between the

[2] 2 Am. Jur. 2d, *Adoption,* p. 863, sec. 4.

[3] 42 Am. Jur. 2d, *Infants,* p. 20, sec. 14.

[4] (1951), 260 Wis. 50, 49 N. W. 2d 759, 51 N. W. 2d 713.

date on which the trial court had taken jurisdiction of the adoption proceedings and the date on which judgment was entered, this court determined that, in the best interest of the child, the statute should be construed so as to eliminate his consent, even though he was the legitimate father prior to the entry of the judgment.

In the second appeal involving the same litigation, *Adoption of Morrison*,[5] this court again held that the consent of the father of an illegitimate child was not required and further observed that adoption proceedings are purely statutory with the requirements being determined solely by the legislature.

Another significant case concerning illegitimate children to come before this court was *In re Aronson*[6] wherein a social worker petitioned the county court to have custody of an eight-year-old minor transferred to a state agency and the rights of his parents terminated. At the time of the proceedings the child was living with Donald Finley (his natural father) and the mother of Donald Finley. The child's natural mother was married to someone other than Donald Finley. This court, after determining that Donald Finley was in fact the child's natural father, was required to determine whether the father of an illegitimate child has a statutory right to appeal from an order of the juvenile court. Before deciding that such illegitimate father could appeal, the court recognized the common-law rule that:

". . . a putative father of an illegitimate child has, in general, the right to custody of such child against all but the mother. . . ."[7]

The court then concluded that due to:

". . . the common-law right of a putative father to custody, we believe that the demands of justice would

---

[5] (1954), 267 Wis. 625, 66 N. W. 2d 732.

[6] (1953), 263 Wis. 604, 58 N. W. 2d 553.

[7] Footnote 6, *supra*, p. 616.

best be served by our holding that a putative father, who voluntarily appears in the juvenile court proceedings, is a proper party thereto possessing a right of appeal, even though the proceedings are not jurisdictionally defective if he has not been notified thereof either by personal service or publication." [8]

The court also stated:

"We concur in the opinion of the attorney general that no summons or notice is required to be given to a putative father not having custody of the child under either sec. 48.06 (2) or sec. 48.07 (7) (am), Stats., because to require such notice might in some instances be inimical to the best interests of the child, and the child's rights are paramount. . . ." [9]

However, when the first *Aronson Case* returned to this court in *In re Aronson*,[10] this court again exhibited its reluctance to recognize any rights of putative fathers when it denied the need to give notice of any proceedings in which their common-law right could be lost.

Later, on the second appeal, this court went on to limit its holding in the first *Aronson Case* by stating at pages 467 and 468:

"In our former opinion (263 Wis. 604, 616) we held that the best interests of the child are paramount in a situation where the same conflict with the rights of a putative father, and because of this no notice is required to be served upon the putative father of the institution of the statutory proceedings to have an infant adjudged a 'neglected child' and for termination of parental rights. We further held, however, that where the putative father appeared in the proceedings and acknowledged that he was the father of the child, the best interests of the child did not require that the putative father be denied the right to appeal to circuit court from the determination made by the juvenile court. However, we regret that we did not go one step further in our former opinion and

[8] *Id.* at pages 616, 617.
[9] *Id.* at page 616.
[10] (1955), 269 Wis. 460, 69 N. W. 2d 470.

state therein that if in either juvenile court, or in the appeal proceedings in circuit court, it should be found that the infant was a neglected child and that parental rights should be terminated, it would not be necessary to recognize the claimed rights of the putative father as 'parental rights' within the meaning of sec. 48.07 (7), Stats., so as to require the termination thereof in the order or judgment. We do now hold the foregoing to be the proper construction to be placed upon such statute."

Thus, the court refused to recognize the claimed rights of the putative father as "parental rights" so as to require the termination thereof in the trial court's order or judgment.

In the instant case, the La Crosse county court terminated the parental rights of the child's mother pursuant to sec. 48.40 (1), Stats.

It is important to note that within ch. 48 of the Wisconsin statutes the word "parent" means the mother if the child is born out of wedlock. Sec. 48.02 (11), Stats.

Sec. 48.40 (1), Stats., provides that the court may terminate all parental rights to a minor with the written consent of the parent to the termination. This authority, coupled with the definition of "parent," is a clear indication that the mother alone has the authority to terminate the parental rights of an illegitimate child. The provisions requiring that notice be given prior to a hearing on termination of parental rights contained within sec. 48.42, require that the parent or parents be notified and it logically follows that this does not require that the notice be given to the putative father.

Sec. 48.43 (1), Stats., provides in part that the court shall transfer guardianship and legal custody of the minor to certain designated agencies or individuals if the court terminates parental rights of the mother, "if the child is illegitimate."

The legislative intent to exclude from consideration as a "parent" is further evidenced by the Revision Committee Note of 1955, which appears immediately

following sec. 48.02, Stats., in either version of the Annotations to the Wisconsin Statutes.

Sec. 48.01 (3), Stats., provides that the best interests of the child are of paramount consideration. We think this explains, at least in part, the failure or refusal, to grant rights asserted here to putative fathers.

Under the statutes regulating adoption proceedings, the putative father also has no rights similar to those asserted by the petitioner. Under sec. 48.84 (1) (b), Stats., the adoption of a minor may be ordered with the written consent of the mother alone if the minor was born out of wedlock. Sub. (3) provides that the consent of the father of a minor born out of wedlock shall not be necessary, even though the father has married the mother, if, prior to the marriage, the mother's parental rights were legally terminated or she consented to the adoption of the minor in the manner provided in sub. (2).

Sec. 48.90 (1) (a), Stats., provides that no petition may be filed unless the child has been in the home of the petitioners for six months, except where one of the petitioners is related to the child by blood, excluding among other persons an alleged or adjudged father of a child born out of wedlock.

Clearly, the relevant Wisconsin statutes grant the mother alone the power to terminate parental rights and to consent to the adoption of any child born out of wedlock. The putative father has no parental rights and no right to notice of any hearing prior to such proceedings. If the law were otherwise, it would have been unnecessary for the legislature to attempt to protect the rights of "the other parent" under sec. 48.43 (2), Stats., where only one parent consents to a termination of parental rights under sec. 48.43 (1). Read together, subs. (1) and (2) of sec. 48.43, empower the court to terminate the parental rights of the mother of an illegitimate child without giving any consideration or notice to the putative father.

Cases cited by petitioner do not support the contention that all putative fathers have parental rights and a right to notice of a hearing prior to termination of parental rights. *In re Welfare of Zink* [11] held there was no necessity to give notice of proceedings for termination of parental rights or adoption to the putative father and that an order terminating such rights initiated on the consent of the mother alone effectively terminated any rights that a putative father may have had. On the other hand, the court observed that the putative father was considered "a natural father" under the Minnesota statutes, whereas, in Wisconsin, this is not the case under sec. 48.02 (11), Stats. The court also observed, however, that the putative father does have a right to be heard if he voluntarily appears at the hearing without notice being given. This position was apparently based upon the father's inclusion within the definition of "a natural father," since the court observed, at page 506, that:

". . . Although it may be so argued, this right does not arise from the fact of parentage or from any recognition of a claim that he has a right to custody secondary only to the mother, but simply because the statute is declaratory of the policy of this state. . . ."

In Wisconsin, the right to voluntarily appear is not recognized by statute. However, in the first *Aronson Case, supra,* it was held that where the putative father appears in the proceedings and admits in open court that he is the father, he is a proper party to such proceedings.

In the second *Aronson Case, supra,* the court limited the purpose of the putative father's appearance by holding that it was not necessary to recognize the claimed rights of the putative father as "parental rights" within the meaning of sec. 48.07 (7), Stats. 1951.

[11] (1963), 264 Minn. 500, 119 N. W. 2d 731.

In the first *Zink Case, supra,* the court assumed that one of the reasons for granting the acknowledged father the right to be heard was to foster and encourage the establishment of paternity so that consequent duty of support could be fixed and enforced. In the second *Zink Case* [12] the court dealt only with the rights of the putative father beyond the right to appear and be heard, and, thereafter, discussed the merits of the father's contentions relative to the custody of the child. In the later *Zink Case* again the court recognized that the Minnesota adoption statutes considered the putative father as a "parent." The Wisconsin statutory law is to the contrary.

In *In re Welfare of Brennan,* [13] the court relied upon the holding and philosophy in the two *Zink Cases* in ruling that a putative father was entitled to be heard if he voluntarily appeared because, under such circumstances, his prompt assertion of a claim to the custody of the child would minimize the risk of trauma to the child or to the adoptive parents. Here the father instituted an action for custody prior to placement of the child by the social service agency.

*In re Mark T.* [14] does not recognize a right in the putative father. The facts in that case indicated that the illegitimate child was born on February 2, 1965, and lived with his natural mother and father until August 2, 1966, the day the mother released the child to an agency for adoption. The appellate court held that the circuit court had the power to award custody to the father of an illegitimate child after the probate court had entered a termination of parental rights in connection with the proposed adoption of the child following the mother's secret release of the child for adoption to a licensed child

[12] *In re Welfare of Zink* (1964), 269 Minn. 535, 132 N. W. 2d 795.

[13] (1965), 270 Minn. 455, 134 N. W. 2d 126.

[14] (1967), 8 Mich. App. 122, 154 N. W. 2d 27.

placement agency. The court limited its ruling in favor of the putative father's rights by the following language, at pages 152 and 153:

". . . However, in affirming the trial judge's ruling we do not recognize a right in the putative father, but rather assert the power of the circuit court to preserve an existing family relationship not only for the benefit of the father but primarily for the benefit of the child. Our holding does not oblige the probate court or a placement agency to notify a putative father (even if they have information as to his identity) of the release of the child for adoption or of the pendency of a petition for his adoption or of the time of hearing on such petition. . . ."

The Michigan court did not recognize any right in the putative father to notice of proposed adoption proceedings and based its ruling upon the fact that a viable familial relationship had been established. Whereas in most cases release of the child occurs soon after birth, with the child never having entered the father's home.

The petitioner here raises an objection to sec. 48.40, Stats., (Termination of Parental Rights Proceedings), as being violative of the equal protection clause of the fourteenth amendment to the United States Constitution.

The question presented is whether the state of Wisconsin can protect the right of married parents and unwed mothers to the custody and control of their children by requiring their consent as a prerequisite to the termination of their parental rights without affording similar protection to the rights of a putative father. In determining the answer to this question two landmark decisions of the United States Supreme Court must be considered.

In *Levy v. Louisiana*,[15] the court reversed a judgment of a Louisiana intermediate court of appeals which had upheld the dismissal of a wrongful death suit under the Louisiana Wrongful Death Statute by five illegitimate

---

[15] (1968), 391 U. S. 68, 88 Sup. Ct. 1509, 20 L. Ed. 2d 436.

children upon the death of their natural mother. The Louisiana court construed the word "child" to mean "legitimate child." This interpretation, which denied illegitimate children a right to recover for the wrongful deaths of either or both of their natural parents was based on morals and general welfare because it discourages bringing children into the world out of wedlock. The United States Supreme Court held that the statute as so construed to deny a right of recovery to illegitimate children contravened the equal protection clause of the fourteenth amendment to the United States Constitution.

In a companion case, *Glona v. American Guarantee Co.,*[16] an unwed mother brought an action under the Louisiana Wrongful Death Statute for the death of her illegitimate child. A federal district court granted summary judgment against the mother and the United States Court of Appeals for the Fifth Circuit affirmed. Again the United States Supreme Court reversed on the grounds that the Louisiana statute as so applied violated the equal protection clause of the fourteenth amendment.

In both of the above cases the Louisiana Wrongful Death Statute distinguished among the classes of children and classes of parents upon the basis that the distinctions would serve to discourage the birth of illegitimate children and thus would serve both morality and general welfare. Obviously, as the court pointed out, it was not a rational basis for a proper classification. However, we think that the distinction between the parents of legitimate children and the fathers of illegitimate children and the distinction of illegitimate children drawn by statutes such as sec. 48.40 and sec. 48.84, Stats., lie on a different basis.

We believe there is a rational basis for classification of putative fathers under adoption statutes, and it lies in the very nature of the adoption process. As stated in *In re Brennan, supra:*

---

[16] (1968), 391 U. S. 73, 88 Sup. Ct. 1515, 20 L. Ed. 2d 441.

". . . It would appear that because disputes of this kind are not common, the right of the out-of-wedlock father to notice and to be heard has either been overlooked or intentionally omitted. This may be explained by historical experience from which it is assumed that the overwhelming percentage of fathers of out-of-wedlock children are not interested in their children, in recognizing them, in supporting them, in legitimating them, or especially in seeking their custody. Moreover, it should be realistically conceded that few of the fathers in this group would be able to present anything like a rational argument that the child's best interests would be served by recognizing the father's desire to obtain custody of the child.

"Accordingly, it would appear that the laws with reference to the adoption of children and the termination of parental rights have been drafted with a view to facilitating the work of welfare agencies in the adoption process. The welfare agencies see the procedure used by the father in this action as a threat to the adoption agency program. They apprehend that if the father can in any way interfere with the adoption process, it may be anticipated that he will continue to seek custody of the child long after it has been placed in an adoptive home; that many previous placements may be jeopardized; and that many qualified couples will, because of the risk, be discouraged from making application to an agency." [17]

In *In re Mark T., supra,* it was stated:

"In recognition of the fact that normally both parents of legitimate children exercise custody and that it is unusual for a putative father to do so, the adoption statute requires consent to adoption by both parents of a legitimate child and only that of the mother where the child is not legitimate. The legislative classification has a substantial basis in experience, is reasonable, and is essential to a workable adoption program. [18]

The Utah Supreme Court in *Thomas v. Children's Aid Society of Ogden* [19] held that the putative father's consent was not necessary prior to adoption and that

[17] Footnote 13, *supra,* at pages 461, 462.
[18] Footnote 14, *supra,* at pages 141, 142.
[19] (1961), 12 Utah 2d 235, 364 Pac. 2d 1029.

no valid constitutional question was raised by the statutory requirements that only the consent of the mother of an illegitimate child be secured, with the court concluding that:

"However, plaintiffs argue that if the statute requires only the consent of the mother of an illegitimate child, and not that of the father, it is unconstitutional because 'it authorizes a private individual to deprive another individual of his natural, statutory, and constitutional rights without a hearing of any kind.' This poses the question as to whether the rights of a father, if any he has, to his illegitimate child come within the purview of the due process clause and various other provisions of the State and Federal Constitutions. We think not. The claim of the plaintiffs is based upon the theory of a chattel ownership of the child, but no such right is capable of legal recognition. The putative father of an illegitimate child occupies no recognized paternal status at common law or under our statutes. The law does not recognize him at all, except that it will make him pay for the child's maintenance if it can find out who he is. The only father it recognizes as having any rights is the father of a legitimate child." [20]

Because of the apparent similarity between the Utah and the Wisconsin statutes and the different definitions in rights set forth under statutes in other jurisdictions, we think the reasoning of the *Thomas Case* can be applied to the instant case.

We conclude (1) that any rights enjoyed by a putative father under common law have been changed or modified by ch. 48, Wis. Stats.; (2) that the putative father of a child born out of wedlock does not have any parental rights; and (3) that the failure of the Wisconsin statutes to grant parental rights or notice of hearing to a putative father prior to termination of parental rights does not constitute a violation of the state or federal constitution.

*By the Court.*—Petition denied.

[20] *Id.* at page 239.

ROBERT W. HANSEN, J. (*concurring*). The temptation is strong to join without comment the clear logic and sound reasoning of the majority opinion. However, I would go further than the majority in holding that a child born out of wedlock has no legal father until court proceedings establish the fact of identity and entitlement to such status. Also, I feel that the petitioner clearly has lost his right to review the children's court order denying his claims by his failure to appeal.

1. *Failure to identify.*

When a child is born to a married woman, the presumption, rebuttable, is that the husband of the mother is the father of the child. So, at the moment of its birth, the child born in wedlock has, presumptively at least, a legal father.

When a child is born to an unmarried woman, it is known only that someone is its father. Who that someone is is not known, and no legal presumption exists to narrow the field of possibilities. So, at the moment of its birth, the child born out of wedlock does not have a father whose status and identity have been legally, even presumptively, determined.

The words, "putative father," describing the someone who in fact sired a child born out of wedlock, has a solid ring. Too solid, if it implies that, at the moment of birth of an illegitimate child, there is in existence one who has legal status as such putative father. That legal identity is established in a courtroom, not a bedroom. It is not created by statements, affidavits or pleadings. It is created by the judgment of a court of competent jurisdiction in appropriate proceedings. Until it is so established, the illegitimate child has no legal father, and no one is entitled to rights or bound by the responsibilities of putative parenthood. It follows that no one is entitled to notice of proceedings as to termination of parental rights or adoption of children born out of wed-

lock unless and until he has established in court that he is, in fact, the father of the illegitimate child. The status is created by the judgment of the court. It does not exist until it is so established.

The dissent here points out that one determined to be the father of a child born out of wedlock must pay lying-in expenses and is responsible for support payments. Why, it asks, "should he be denied correlative rights?" The answer is that both rights and responsibilities follow a court adjudication as to paternity. Neither exists until identity is established, and legal status determined. The dissenter's conclusion that "such a father" should have "rights to custody which should not be destroyed or terminated without notice to him and a fair hearing and for proper reasons," falls, not because of administrative difficulties involved, but because until a court acts to determine paternity of children born out of wedlock, no one has the legal status and identity to which rights and responsibilities alike relate. The required first step for the petitioner here was to establish in court that he was in fact and law the father of the child. Without such status, his claims to rights to notice, hearing or custody have no foundation upon which to be based. Denied by a trial court a determination that he was such father, his second and only available step was to appeal the court order denying his claim of such status and claims of right based thereon.

2. *Failure to appeal.*

In its Children's Code, the Wisconsin legislature has provided that:

"Any person aggrieved by an adjudication of the county court under this chapter and directly affected thereby has the right to appeal to the circuit court in the same county within 40 days of the entry of the order . . . ." Sec. 48.47, Stats.

Here, on December 5, 1968, the petitioner petitioned the county court of La Crosse county for an order vacating its earlier order terminating the parental rights of the child's mother and appointing Lutheran Social Services of Wisconsin as guardian of the child. Subsequently, a hearing on this petition was held, and, on November 11, 1969, the court entered judgment denying the petition. As a final judgment denying the rights and relief sought by petitioner, that judgment clearly was appealable. It was not appealed, and the time for appeal has long ago expired. So the petitioner not only slept with the mother of the child, he also slept on his right to appeal, and lost such right by such sleeping.

There is sound public policy involved in the statutory insistence that appeals from orders affecting the future life and well-being of children be made within a forty-day period. The majority opinion states well the tragic consequences of time-consuming delays in the proper, prompt and permanent placement of illegitimate children in stable home surroundings with adoptive parents. It is bad enough that the disposition of criminal prosecutions is delayed for months and years. It is sad enough that crowded court calendars delay trials of personal injury actions for even longer. At least the legislature has sought to avoid similar delays in the appeals of orders entered under the authority of the Children's Code. There is no good reason why a petitioner who has elected not to appeal a county court order denying his claim of rights as a "putative father" should be permitted to evade the forty-day limit on children's court appeals by much later seeking a writ that is a clear attempt to review and reverse the county court order which can no longer be appealed. So I would deny the writ. In fact, I would not have entertained it in the first place.

HALLOWS, C. J. (*dissenting*). I believe that a father of a child born out of wedlock should have parental rights

and such rights should not be terminated without either his consent or notice of hearing and for good cause. But more important, I think a child born out of wedlock should have rights which should be recognized as zealously and wholeheartedly as those of a child born in wedlock. The common-law concept of an illegitimate child being a *nullius filius* and within the doctrine of *filius populi*, stigmatized with shame and called a bastard although he was in no way responsible for the condition of his birth is an archaic, inhuman, and unsocial view.

I think secs. 48.42 and 48.43, Stats., relating to termination of parental rights and sec. 48.84 (1) (b) and (3), relating to adoptions, requiring only the consent of the mother, are unconstitutional when applied to a known father of a child born out of wedlock because they make a violation and a classification out of illegitimacy which is unreasonable and has no basis in fact excepting expediency. In *Levy v. Louisiana* (1968), 391 U. S. 68, 88 Sup. Ct. 1509; 20 L. Ed. 2d 436, the supreme court in holding unconstitutional a classification based upon illegitimacy as a basis for recovery under a wrongful-death statute stated, page 70:

"We start from the premises that illegitimate children are not 'nonpersons.' They are humans, live, and have their being. They are clearly 'persons' within the meaning of the Equal Protection Clause of the Fourteenth amendment."

The court continued, page 71:

"In applying the Equal Protection Clause to social and economic legislation, we give great latitude to the legislature in making classifications. *Williamson v. Lee Optical Co.,* 348 U. S. 483, 489; *Morey v. Doud, supra,* at 465–466. . . . we have been extremely sensitive when it comes to basic civil rights (*Skinner v. Oklahoma, supra,* at 541; *Harper v. Virginia Board of Elections,* 383 U. S. 663, 669–670) and have not hesitated to strike down an invidious classification even though it had his-

tory and tradition on its side. (*Brown v. Board of Education*, 347 U. S. 483; *Harper v. Virginia Board of Elections, supra*, at 669). The rights asserted here involve the intimate, familial relationship between a child and his own mother. . . . Why should the illegitimate child be denied rights merely because of his birth out of wedlock? He certainly is subject to all the responsibilities of a citizen, including the payment of taxes and conscription under the Selective Service Act. How under our constitutional regime can he be denied correlative rights which other citizens enjoy?"

*See also* the related case of *Glona v. American Guarantee Co.* (1968), 391 U. S. 73, 88 Sup. Ct. 1515, 20 L. Ed. 2d 441.

I do not agree with the argument that a valid distinction exists between these cases and the case at bar. If illegitimacy is an unreasonable classification as a basis for recovering money, so much more should it be when it relates to the termination of an intimate familial relationship and paternity. I think the majority decision ignores the basic reasoning of those cases.

If a child born out of wedlock has a recognized right to have a mother and a family relationship, why must he be denied a father? Does the best interest of the child as a matter of law always demand even before the father's identity is known, or even when his identity and his wishes are known, that his rights must be terminated and the child cared for by strangers; and more shocking, that no notice need be given to him of the termination of parental rights? In considering the best interest of the child, this court said in *Lacher v. Venus* (1922), 177 Wis. 558, 569, 570, 188 N. W. 613:

"A natural affection between the parents and offspring, though it may be naught but a refined animal instinct and stronger from the parent down than from the child up, has always been recognized as an inherent, natural right, for the protection of which, just as much as for the protection of the rights of the individual to

life, liberty, and the pursuit of happiness, our government is formed. We trust that it will never become the established doctrine that the state shall say to the parents, and particularly to the mother, she who doth travail, and in great pain bring forth her child and after labor doth rejoice that the child is born, that there is but a mere privilege and not a right to the subsequent affection, comfort, and pride of and in such child. . . .

"A money judgment entered against one without due notice is void. [citation omitted]

"If a man's money shall not be legally taken away from him save by due process of law, much less shall his child.

"We do not deem it necessary to base this decision upon or dwell at any length upon such possible sordid, because material, grounds for our conclusion, but rest it upon the natural right of parenthood, a far finer and higher quality, and for that reason more sacredly to be upheld."

Blood is thicker than water. What has the child to say to all of this? It is claimed any rights of the father can only rest on the concept of chattel ownership of the child; not so. He is the biological, spiritual and natural father. It is the state in the role of a Good Samaritan with its theory of nonrights that treat the child as chattel. It is claimed the father would profit from his sin if his rights were recognized; yet the mother so profits. A father is required to pay the expenses of the mother for the birth of a child born out of wedlock and is responsible for its support; why should he be denied correlative rights? As the supreme court said in *Levy v. Louisiana, supra,* page 71:

"Why should the illegitimate child be denied rights merely because of his birth out of wedlock? He certainly is subject to all the responsibilities of a citizen, including the payment of taxes and conscription under the Selective Service Act. How under our constitutional regime can he be denied correlative rights which other citizens enjoy?"

I do not take the position that every father of an illegitimate child should have custody; but what I do

contend is that such a father should have rights to custody which should not be destroyed or terminated without notice to him and a fair hearing and for proper reasons. The practical difficulty in recognizing parental rights of a father lies in the manner in which such rights are to be protected and the time within which they are to be exercised. *See* Comment, *Disposition of the Illegitimate Child—Father's Right to Notice,* U. of Ill. L. Forum (1968) 232; Note, *Father of an Illegitimate Child—His Right to be Heard,* 50 Minn. L. Rev. (1966), 1071.

The only basis given by the majority for the reasonableness of the classification based on illegitimacy is the nature of the adoptive process. But this argument is based not so much upon the essential nature of the adoption process as it is the convenience of what social welfare agencies consider to be necessary for their work. I think much of the fears of the social agencies in this field are groundless and their beneficial and humane work in the adoption field can be carried on successfully without ignoring the rights of the natural father. The difficulties of administration do not justify the complete elimination of the father's consent for the termination of his parental rights in each and every case. If the natural father is known he should be given notice of termination of parental rights. The mother should be required to disclose the identity of the father of the child, if she knows; and if the circumstances are such that she does not know, then the case is one which the law cannot do very much about. Under the present law, fathers must come forward. But how can such a father come forward if there is no notice?

I would require a mother petitioning for termination of parental rights to disclose the identity of the father and require notice of the hearing to be given to the father. If the father defaults, the court should be permitted to

enter a consent on his behalf. If the father appears, the termination would be decided on its merits. *See* Annot. (1954), *Right of putative father to custody of illegitimate child,* 37 A. L. R. 2d 882, for cases granting an admitted father the custody of his illegitimate child as against relatives.

In the case at bar, the petitioner should be given the opportunity to prove his paternity which he had acknowledged and if proved, his competency and suitability to care for the child on the issue of whether his parental rights to custody should be terminated.