# IN RE WELFARE OF BABY BOY ZINK.

132 N. W. (2d) 795.

December 18, 1964—Nos. 39,213, 39,328, 39,371.

*Douglas Hall,* for appellant.

*George M. Scott,* County Attorney, and *Douglas X. Juneau, Gerard Snell* and *William S. Posten,* Assistant County Attorneys, for respondent Hennepin County Welfare Department.

*Mackall, Crounse, Moore, Helmey & Holmes* and *Floyd E. Nelson,* for respondent Children's Home Society of Minnesota.

*Harvey E. Skaar,* for respondent Zink.

*Walter U. Hauser,* for Lutheran Children's Friend Society of Minnesota, amicus curiae.

*James D. Kempf,* for Lutheran Welfare Society of Minnesota, amicus curiae.

*James H. Levy,* for Jewish Family Service, amicus curiae.

*Robert L. Speeter,* for Catholic Welfare Association of Minneapolis, Catholic Charities Diocese of Winona, Inc., and Diocesan Catholic Charities Archdiocese of St. Paul, amici curiae.

MURPHY, JUSTICE.

This is an appeal from an order of the juvenile court terminating the parental rights of the mother and of appellant, Thomas E. McDonald, the putative father of an illegitimate child. The proceedings were brought pursuant to Minn. St. 260.221[1] and 260.231,[2] which govern the grounds and procedures for terminating parental rights. The key issue presented is whether the trial court erred in terminating the parental rights of the admitted father in a proceeding initiated to terminate the parental rights of the natural mother.

This case was before us in a former proceeding instituted by a pe-

---

[1]So far as applicable here, Minn. St. 260.221 provides: "The juvenile court may, upon petition, terminate all rights of parents to a child in the following cases:

"(a)  With the written consent of parents who for good cause desire to terminate their parental rights; or

"(b)  If it finds that one or more of the following conditions exist:

\* \* \* \* \*

"(4)  That the parents are unfit by reason of \* \* \* conduct found by the court to be likely to be detrimental to the physical or mental health or morals of the child."

[2]So far as applicable to the facts in this case, § 260.231 provides: "Subd. 2. The termination of parental rights under the provisions of section 260.221, shall be made only after a hearing before the court, in the manner provided in section 260.155.

"Subd. 3. The court shall have notice of the time, place, and purpose of the hearing served on the parents in the manner provided in sections 260.135 and 260.141, except that personal service shall be made at least ten days before the day of the hearing; published notice shall be made for three weeks, the last publication to be at least ten days before the day of the hearing; and notice sent by certified mail shall be mailed at least 20 days before the day of the hearing. A parent who consents to the termination of parental rights under the provisions of section 260.221, clause (a), may waive in writing the notice required by this subdivision; however, if the parent is a minor or incompetent his waiver shall be effective only if his guardian ad litem concurs in writing."

tition of the Hennepin County Welfare Department for an order terminating the mother's parental rights to the child. That proceeding was started after the mother had executed a written consent by which she agreed to the commitment of her child to an appropriate agency for the purpose of placing the child for adoption. Appellant voluntarily appeared and sought intervention as a party. He was denied the right to present evidence or to cross-examine any of the witnesses who testified. We reversed the order of the trial court terminating parental rights to the child and remanded the case, holding that the father who acknowledged his paternity was entitled by the express provisions of § 260.155 to present evidence and to cross-examine witnesses. In re Welfare of Zink, 264 Minn. 500, 119 N. W. (2d) 731. The various statutory provisions relating to proceedings to terminate parental rights are discussed at length in that decision.

When the case was returned to the lower court, the proceedings were commenced anew. Appellant participated fully. He was represented by counsel and submitted evidence as to his fitness to have custody of the child and in support of his claim that the rights of parenthood should not be terminated as to him. The trial court ordered all parental rights terminated. Three appeals followed and have been consolidated. We review the appeal from the order terminating parental rights. The other appeals are from the judgment entered on the order and from an order discharging a writ of habeas corpus. Assuming the last two appeals are properly before us, we treat them as cumulative since the issues raised are embraced within those which we review on appeal from the order terminating parental rights.

From the record it appears that the child was born to Audrey Zink on July 3, 1961. At that time she was married to Robert L. Zink. They were divorced in June 1962. Robert Zink and appellant were business and social friends. At and prior to the time of conception and while still married, Robert Zink was keeping company with his present wife, Patricia. Robert Zink was not unaware of the fact that appellant was carrying on with his wife. Audrey and appellant met at the apartment maintained by Zink for his girl friend about twice a week during the summer of 1960 and until February 1961. During this time they

had intimate relations on numerous occasions, including one time in Audrey's home when the husband was on the premises. Appellant did not deny his relationship with Audrey and admitted their meetings at Patricia's apartment and at several hotels where he registered under an assumed name. A further account of the association of the parties is unnecessary. In its most charitable aspect, the record would indicate that they were parties to a loose, social relationship.

It appears that appellant, who was 47 years of age at the time of the trial, has enjoyed a modest success in the operation of a photographic studio. He lived as husband and wife with a woman 14 years his senior. They were thought by his relatives and neighbors to be husband and wife and they falsely represented that they were married to both the social security and Federal income tax departments. They were not married until March 1961, and then only for the purpose of acquiring a family status which would make the appellant more eligible to have custody of the child. Appellant's present wife testified that she did not marry him sooner because of her age and her doubts that their relationship was stable. She stated that she married him primarily to receive the child. She admitted that she may have told a social worker from the Hennepin County Welfare Department that appellant had been intimate with at least 15 women, none of whom became pregnant. The record suggests that appellant's conduct was motivated less by lascivious propensities than by an urge to father a child.

It appears that Audrey's petition to have her parental rights terminated as to the child was prompted by her desire to protect her legal son from the burdens or embarrassment of being raised with an illegitimate brother. After she became pregnant, she signed a paper giving appellant all rights to the unborn child. At this time she understood or assumed that appellant was a married man. She claimed that appellant promised to pay the medical bills but never did so. She repudiated her consent to surrender rights to the child to appellant when she learned that he was unmarried and when he failed to pay the medical bills as he had promised. She has accordingly taken the position that appellant is not morally responsible and should not have the child.

The law which is controlling is stated in the former case of In

re Welfare of Zink, 264 Minn. 500, 505, 119 N. W. (2d) 731, 735, where we said:

"* * * [A] putative father cannot challenge the validity of an order terminating parental rights on the ground that he failed to receive notice. Further, an order terminating such rights, initiated upon the consent of a mother, effectually terminates any rights that the putative father may have in the same way that the rights of a nonconsenting father of a legitimate child would be terminated where there has been compliance with procedural requirements as to notice and hearing."

We went on to say, however, (264 Minn. 506, 119 N. W. [2d] 735) that the putative father is nevertheless "considered a parent in proceedings to terminate parental rights" and that when he appears at the hearing "he has the right to be heard, to cross-examine, and to present evidence directed at the primary and all-pervading issue— the welfare of the child."

The question raised now is what are the rights of the father of an illegitimate child in these proceedings beyond the right to appear and to be heard.

In In re Welfare of Shady, 264 Minn. 222, 118 N. W. (2d) 449, the question presented was whether a juvenile court, over the objection of the mother of an illegitimate child and without any showing that the child actually was being neglected, could, without a hearing and determination of dependency or neglect, remove the child from the custody of the admitted father. We there said (264 Minn. 228, 118 N. W. [2d] 453):

"That the putative father of an illegitimate child is considered to be a parent is evidenced from the adoption statutes, * * *.

* * * * *

"While the admitted father of an illegitimate child may not have the same rights to custody as a father whose child is born of a lawful marriage, he has some rights. Under our inheritance laws, admission of paternity gives the child a right to inherit from the father. § 525.172. It may be that under circumstances such as we have here the child will have a better home with the putative father than with an entire

stranger. It has been held that the rights of a putative father to the custody of an illegitimate child, while inferior to those of a mother, are superior to the rights of any other person."

There are numerous authorities upholding an award of custody of an illegitimate child to the admitted father as against the claim of various relatives of the child, such as grandparents, aunts, uncles, sisters, etc., where the evidence showed the father to be a suitable person, or at least there was nothing to show him to be an improper person, and even though in some instances the relative or relatives contesting the right with the father were in a better financial condition than the father and just as decent and respectable.[3] The general rule which we follow is that an award of custody of an illegitimate child to the admitted father as against the claims of relatives and welfare agencies may be approved under circumstances where the mother rejects the child and the putative father is competent to care for and suitable to take charge of the child;[4] but such rights of custody must always be subordinated to the best interests and welfare of the child.[5]

■ We must accordingly examine the record to determine whether or not it supports the findings and conclusions of the court below to the effect that the best interests of the child require termination of parental rights. The trial court found:

"Thomas McDonald desires to raise the child, whom he has never seen, having an obsession for a son of his own blood. He married his first wife because she had a child. He lost that child to its father at

---

[3] Annotation, 37 A. L. R. (2d) 882.

[4] In In re Welfare of Zink, 264 Minn. 500, 507, 119 N. W. (2d) 731, 736, we held: "* * * [W]here a putative father in fact appears at such hearing and acknowledges his paternity he must be afforded the rights specifically granted by § 260.155, subd. 6, to the end that his contentions, availability, or plan regarding the best welfare of the child may be considered by the court, in contrast to any other plan or proposal urged by the mother, any child welfare agencies, or interested parties."

In In re Welfare of Barron, 268 Minn. 48, 127 N. W. (2d) 702, we also discussed procedures under § 260.131 to adjudge a child dependent or neglected and under § 260.221 to terminate parental rights.

[5] 10 Am. Jur. (2d) Bastards, § 62.

her death. He is 47 years old, his second and present wife 61. They have been married less than two years though they lived together in a common law situation for sufficient years to indicate a stability of their relationship. Their marriage was postponed partly for the reason that she did not seem able to bear him a child, marrying in order to obtain this child. For 18 years he has operated a photography business, specializing in children. He is well thought of by those he buys from, works with, and sells to. He has lived in one home for some years and is well thought of by his neighbors, particularly for his kindness to children. He is competently active in church, educational, and civic activities, particularly those concerned with children. He has had intercourse with many women, apparently more for reproduction than pleasure. He remains on terms of social and business friendship with Robert Zink and is actively disliked by Audrey Zink."

In its conclusions of law the trial court stated that although the preponderance of the evidence indicated appellant's paternity, he was not a fit person to have custody of the child. The conclusions of law recite:

"Thomas McDonald will be nearly seventy, his wife nearly eighty, when the child attains maturity. Both have flaunted basic moral strictures of society. He has been compulsively dominated by an obsession with a highminded objective, but the end will not justify the means. He is a reputable person, not of good moral character. In the McDonald home, the child's whereabouts would be known to Audrey Zink and Robert Zink, with the consequent persistent potential for emotional confusion to the child."

In the memorandum accompanying a subsequent order denying a petition by appellant for a writ of habeas corpus, the trial court noted that appellant had sustained his burden of proof "as to his willingness and as to his capability." The court added:

"* * * But he did not sustain the burden of proving his fitness to have the custody of the child. He proved an excellent reputation in the community. He proved a deep interest in children. He proved financial ability. But he was demonstrated to be immoral. His sexual be-

542

havior is beyond the pale. He has flaunted society's laws and society's conscience by his relations with the woman now his wife; with the mother of the child who was the wife of another man, and there are indications of his involvements with other women. He did not sustain his burdens of proof, he has no further substantive or procedural rights."

From a careful examination of the record we must conclude that there is sufficient evidence to support the findings and conclusions of the court and that appellant was given all the procedural protection to which he was entitled. Moreover, we must be controlled by the often-repeated rule that when an action is tried by a court without a jury, its findings of fact are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence. 1 Dunnell, Dig. (3 ed.) § 411. Accordingly, the appeals before us are affirmed.

Affirmed.