134 N.W.2d 126 (1965)
In re Welfare of Baby Girl BRENNAN.
Mohummed SADDEN, Plaintiff, Respondent,
v.
Linda BRENNAN and Lutheran Social Service, Defendants, Appellants.
Nos. 39566, 39614.
Supreme Court of Minnesota.
March 19, 1965.
*128 John P. Karos, Minneapolis, for Linda Brennan.
Kempf & Ticen, Bloomington, for Lutheran Social Service.
Walter N. Trenerry, David R. Roberts, St. Paul, for respondent.
Robert J. Levy, Professor of Law, University of Minnesota, Walter U. Hauser, James H. Levy, St. Paul, Robert L. Speeter, Floyd E. Nelson, George M. Scott, County Atty., Douglas X. Junea, Asst. County Atty., Minneapolis, amici curiæ.
MURPHY, Justice.
By an order of the juvenile division of the District Court of Hennepin County, respondent, Mohummed Sadden, was determined to be the father of an illegitimate child and entitled to notice of all proceedings relating to the child. Appeals by the mother and Lutheran Social Service, an agency with which the child has been placed for adoption, from an order denying their subsequent motion for amended findings or a new trial raise the issue as to whether the natural father of an illegitimate child has any legally cognizable interest in the child, and if so, whether that interest can be asserted without the possibility of irreparable harm to the child's eventual best interests and without jeopardizing the integrity of welfare agency adoption practices in the State of Minnesota.
The proceedings were started by a complaint in which respondent alleged the birth of the child; that he repeatedly asked the mother to marry him; that she refused and has given custody of the child to a social service agency. By his complaint he sought custody of the child and an order restraining further proceedings to adopt the child. The defense, as set up by the answer of the mother and Lutheran Social Service, was that the custody of the child had been properly given to Lutheran Social Service and that she was being maintained in a foster home preliminary to adoption. They assert that the father is without legal rights and the court without jurisdiction to hear his claim. The findings of the trial court recite the pertinent facts. They are:
"The child was conceived as a result of an illegitimate alliance between two college students who for some time before and for some time after had romantic inclinations toward each other. Both come of good families from about the same part of the country. Marriage had been discussed. When the pregnancy became known to them, the father again proposed marriage, on more than one occasion and with evident sincerity; the mother's interest waned to the extent that marriage is not now a possibility.
"Various plans for the child were put forward thereafter: that the mother with her relatives raise the child, that the father with his relatives raise the child, that the child be placed for adoption. The plans were each discussed, apparently quite thoroughly, by the mother and the father and various of their relatives. They were unable to agree.

*129 "The mother is a protestant Christian, 20 years of age, residing in northeastern Nebraska with her family. She is unable to provide a permanent home for the child either by herself or with her relatives. She desires, therefore, to terminate her parental rights, but for adoptive placement with strangers. She does not want the child placed with the father, partly from animosity toward him, partly because of religious differences, and partly because she believes that, with the father, the child will know its origins and that such knowledge would be detrimental to it.
"The father is a Moslem, dark complected as is the child, 23 years of age, residing in northwestern Iowa, currently attending the first year of law school at the University of Nebraska. He desires to raise the child. His family are long-time and well respected members of their community, economically comfortable and of good moral character. They have proffered financial assistance to the extent necessary. One of his sisters is married to a successful physician in Iowa and lives in a six-bedroom home with her husband and six-year-old child. The other of his sisters is married to an electrical engineer in Minneapolis and currently living in an apartment while looking for a house to purchase.
"The father proposes to place the child with one of his sisters until he has completed law school and is married at which time he would take over the raising of the child. Both sisters have offered their homes for this purpose, both homes are excellent. The father would visit the child frequently during this interim period and would provide some support for himself and the child through employment which he now has. He is not now married and has no candidate currently for marriage. He would raise the child as a Moslem and would disclose to the child the facts of her origin when appropriate. He is of good character though he has lost his temper on one occasion.
"Lutheran Social Service is ready, willing, and able to accept the child and is confident of placing it in a qualified Christian adoptive home, the plan which the mother urges."
In its conclusions of law the court found that the father was a fit person to raise the child and, subject to certain contingencies, had a realistic plan for it. The court also found, with reservations, that the plan of the mother and the Lutheran Social Service was equally realistic. The court did not determine which of the plans was for the best interest of the child and limited itself to the following determination:
"The appropriate officers of the State of Minnesota are ordered to enter [respondent's] name as father on the birth certificate of the child, indicating his age as 23, his occupation as student, and preserving the categorization of the child [as] illegitimate."
The order further provided that the putative father "shall henceforth be duly notified of all proceedings relating to the child."
Appellants insist that the order of the trial court should be set aside and vacated for the asserted reason that the court was without jurisdiction and acted beyond its power. They argue that there is no authority in law either for the right asserted or the remedy sought. They argue that the father of an illegitimate child has no rights with respect to the child except those given to him by statute. They cite In re Adoption of Anderson, 235 Minn. 192, 197, 50 N.W.2d 278, 283, to the effect that "[t]he power to decree an adoption being purely statutory, the statute is the measure of the court's authority."
Appellants would have us ignore the real character of this proceeding, which is one by a father to secure custody of his illegitimate child. They argue in effect that it is an illegal and unauthorized procedure *130 which, by collateral means, seeks to frustrate the adoption process provided by Minn.St. c. 259, which relates to adoption, and § 260.221, which provides for termination of parental rights of dependent and neglected children and thus lays the groundwork for adoption under c. 259. They argue that adoption proceedings have already been instituted by the mother under c. 259 and assert that where the mother proceeds by a "direct surrender" of the child to a welfare agency pursuant to that chapter, the out-of-wedlock father is not entitled to be heard unless the adopting court so orders after having determined such hearing to be in the best interests of the child. They insist that the statutory scheme with reference to adoption does not comprehend notice to the father or consent by him.
By the provisions of Minn.St. 259.25, subd. 1, the mother of an illegitimate child is permitted to enter into an agreement with a welfare agency giving it authority to place the child for adoption. It is provided by § 259.24, subd. 1(a), that the consent of the father of an illegitimate child to adoption "shall not be required" and by § 259.24, subd. 1(f), that the agency "shall have the exclusive right to consent to the adoption of such child."[1]
We pointed out in the first of the two Zink cases (In re Welfare of Zink, 264 Minn. 500, 119 N.W.2d 731; Id. 269 Minn. 535, 132 N.W.2d 795) that the adoption laws as well as the sections of the Juvenile Court Act pertaining to termination of parental rights do not provide for notice to the out-of-wedlock father and that his consent is not a prerequisite to adoption. We held, nevertheless, that where the father voluntarily appears at a hearing and acknowledges his paternity for the record, he is entitled by the provisions of § 260.155 to be heard, to present evidence, and to cross-examine witnesses. Appellants contend that while the out-of-wedlock father may have the right to appear and participate in proceedings to terminate parental rights under the provisions of c. 260, no such right is granted under the "direct surrender" procedure permitted by c. 259. If we were to agree with appellants, we would have to conclude that if the mother of an illegitimate child decides to use the procedure employed here, the out-of-wedlock father would be effectively deprived of an opportunity to express an interest in his child.
1. We are of the opinion, however, that the issue presented should not be determined by focusing solely on one or another chapter of the statutory pattern. The proceeding before us is one for the custody of a child and not for the adoption of it, nor for the termination of parental rights. In view of the arguments asserted by appellants both orally and by brief, we might say by way of dicta that it is difficult to segment the provisions of cc. 260 and 259 as they relate to the adoption process. These provisions are complementary and interrelated. As we said in the first Zink case, 264 Minn. 500, 119 N.W.2d 731, the adoption laws and the sections of the Juvenile Court Act pertaining to termination of parental rights should be construed together to effect an overall purpose. Although consent of the unwed father is clearly unnecessary in adoption proceedings by reason of § 259.24, subd. 1(a), we permitted the father in both of the Zink cases to intervene in a proceeding under c. 260 for termination of parental rights which was obviously only a preliminary step to an agency placement of the child for adoption.
As pointed out by brief amicus curiae, the statutory provisions are not clear as to the rights and remedies afforded natural parents, adoptive parents, and adoption *131 agencies when their interests compete.[2] The situation with which we are here presented was not specifically provided for by the legislature. It would appear that because disputes of this kind are not common, the right of the out-of-wedlock father to notice and to be heard has either been overlooked or intentionally omitted.[3] This may be explained by historical experience from which it is assumed that the overwhelming percentage of fathers of out-of-wedlock children are not interested in their children, in recognizing them, in supporting them, in legitimating them, or especially in seeking their custody. Moreover, it should be realistically conceded that few of the fathers in this group would be able to present anything like a rational argument that the child's best interests would be served by recognizing the father's desire to obtain custody of the child.
Accordingly, it would appear that the laws with reference to the adoption of children and the termination of parental rights have been drafted with a view to facilitating the work of welfare agencies in the adoption process. The welfare agencies see the procedure used by the father in this action as a threat to the adoption agency program. They apprehend that if the father can in any way interfere with the adoption process, it may be anticipated that he will continue to seek custody of the child long after it has been placed in an adoptive home; that many previous placements may be jeopardized; and that many qualified couples will, because of the risk, be discouraged from making application to an agency.
2. Courts are well aware of the just concern of welfare agencies in a sound adoption program and appreciate that such a program is essential to the best interests of a great majority of children born out of wedlock. Courts are aware that removal of children from adoptive homes following placement may be harmful and, if accomplished frequently enough, will deter qualified and deserving prospective parents from applying for an adoptive child. The courts are also aware that the uncertainty as to its status is not only harmful to the child but also frustrates and makes more difficult the work of the adoption agencies.
But we think it should be said in light of judicial experience that the expressed fears of the welfare agencies are not entirely warranted. It has not been the policy of the courts to prefer the claims of the unwed father as opposed to the claims of welfare agencies where the granting of the father's claim would be harmful to the child's welfare. This policy is demonstrated by the last Zink case, In re Welfare of Zink, 269 Minn. 535, 132 N.W.2d 795, from which it clearly appears that courts will hesitate to upset an adoptive placement at the behest of the out-of-wedlock father.
3-4. But, as recent decisions indicate,[4] courts express a natural and understandable willingness to listen to a natural parent who asserts a sincere interest in and concern for his child. Certainly, in the case before us, where a mother seeks to relinquish the child and refuses marriage to *132 legitimate it, a court cannot well look with indifference on the interest of the father who wishes to raise and provide for it.[5] Even though the out-of-wedlock father does not appear before the court in the most favorable light, he should nevertheless be given an opportunity to express his interest when the mother has relinquished the child. A sincere concern which springs from a sense of responsibility to his own flesh and blood is reason enough to permit him to be heard. Although this policy may present some risk for the adoption process, it should nevertheless be permitted where the claim is asserted promptly and under circumstances to minimize the risk of trauma to the child or to the adoptive parents which would accompany judicial acceptance of his assertion.
It should be conceded that by the procedure he followed, respondent here has tried to minimize these risks. He was aware of the fact that many private agencies handle their adoptions by means of "direct surrenders" without the intermediate step of a termination of parental rights under c. 260. Had he not acted, he might have waited in vain for an appropriate opportunity to be heard. He should not be denied his day in court because he chose perhaps the only method open to him of asserting his interest. To hold that the out-of-wedlock father may appear to express his interest only in proceedings to terminate parental rights under c. 260 would, in effect, result in leaving him without rights, since the mother might under proceedings instituted by "direct surrender" under the provisions of c. 259 effectively deprive the father of any opportunity to express his interest in the child. If it is true, as we stated in our prior decisions, that the father has some rights with respect to the child, there is no reason why he could not proceed as he did here. If he had failed to start this proceeding, his rights would have been jeopardized. Had the child been placed in an adoptive home, the rights of the prospective parents would have to be considered, which might greatly diminish the father's rights. To say that he must wait until proceedings are instituted to terminate parental rights, would imply that the rights are without remedies.
5. We find ourselves in agreement with the trial court. Actually the proceedings are in the nature of an equitable action to establish respondent's status as the father of the child and his right to have notice of proceedings taken with reference to the adoption of the child. With this determination he may now proceed to have his rights to custody of the child established according to the following principles stated in In re Welfare of Zink, 269 Minn. 535, 540, 132 N.W.2d 795, 798:
"* * * [A]n award of custody of an illegitimate child to the admitted father as against the claims of relatives and welfare agencies may be approved under circumstances where the mother rejects the child and the putative father is competent to care for and suitable to take charge of the child; but such rights of custody must always be subordinated to the best interests and welfare of the child."
Neither party is satisfied with the decision of the lower court and both are of the view that on appeal this court might finally resolve the basic issue of custody on the merits. This we decline to do. It is for the trial court to determine in further proceedings what is for the best interests and welfare of the child. Moreover, we decline the invitation of the parties to extend this opinion by discussing or suggesting what action the legislature should take to more adequately define the rights of the unwed father or to indicate a procedure by which they should be asserted. The subject of recognition by the father is discussed at length in Annotation, 33 A.L.R.2d 705.
*133 We are constrained to say only that if the parties do not propose to proceed under existing statutes which permit a determination of the conflicting interests of the parties, it is the obligation of the father, if he insists upon asserting his right to custody, to act promptly by habeas corpus or other appropriate proceedings to determine that right on the basis of what is for the best interests of the child. Minn.St. 589.01; State ex rel. Evangelical Lutheran K. Society of Minnesota v. White, 123 Minn. 508, 144 N.W. 157.
Affirmed.
NOTES
[1] It should be emphasized that Minn.St. 259.25, subd. 2, provides that the placement agreement may be revoked by the order of a court of competent jurisdiction "after written findings that such revocation is for the best interest of the child."
[2] A helpful brief amicus curiae has been submitted by Professor Robert J. Levy of the faculty of the University of Minnesota Law School.
[3] Although there is no provision by Minnesota law for an out-of-wedlock father to legitimate the child, there are nevertheless statutory provisions which permit the child to inherit from him (Minn.St. 525.172) and other statutory provisions which place upon the father certain responsibilities. He is required by § 257.23 to pay for the "care, maintenance, and education" of the child and is required to pay medical expenses of the mother. In re Estate of Karger, 253 Minn. 542, 93 N.W.2d 137. He is also required to pay expenses of the mother for maintenance for a period prior to and after confinement and expenses incurred if the child is stillborn or dies after birth. § 257.24.
[4] In re Welfare of Zink, 264 Minn. 500, 119 N.W.2d 731; Id. 269 Minn. 535, 132 N.W.2d 795; In re Welfare of Shady, 264 Minn. 222, 118 N.W.2d 449.
[5] Guardianship of Smith, 42 Cal.2d 91, 265 P.2d 888, 37 A.L.R.2d 867.