IN THE MATTER OF MARY DOE II, A CHILD
WHOSE ADOPTION IS SOUGHT TO BE FACILI-
TATED BY THE TERMINATION OF THE PAREN-
TAL RIGHTS OF MARY DOE I, SOLE LEGAL
PARENT OF THE SAID CHILD, AND OF ALL
OTHER PERSONS.

No. 4901.

DECEMBER 23, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ.,
AND CIRCUIT JUDGE HAWKINS IN PLACE OF
KOBAYASHI, J., DISQUALIFIED.

OPINION OF THE COURT BY MARUMOTO, J.

This is an appeal by the natural father of a child born out of wedlock from a family court judgment entered pursuant to a petition for termination of parental rights filed by the mother which adjudicated, *inter alia:* (1) that the parental rights of the mother as the sole legal parent of the child be terminated; (2) that the department of social services be given the care and custody of the child and be authorized to consent to the child's adoption by suitable adoptive parents and (3) that the father has no custodial or other parental rights to the child which are subject to termination under HRS §§ 571-61 to 571-63, and, consequently, the prayer for termination of such rights be denied.[1]

The child, a female, was born on October 17, 1968, in Honolulu. The mother is a Filipina, and the father a Caucasian. At the time of the child's birth, the mother was 23 years old, unmarried, and a student at the university; and the father was 30 years old, married, and an employee of the post office.

The mother found out in February 1968 that she was pregnant. When the father was told about it, he proposed to the mother that they marry. The father was not married at that time. The mother agreed at first, but later changed her mind.

In July 1968, the mother consulted the Child and Family Service on adoption planning. She did so because her personal circumstances did not permit her to rear the child and she thought that the best future for the child lay in her adoption by good adoptive parents.

When the child was born, the father attempted to see the mother and the child at the hospital, but was told by a hospital attendant that he could not see either of them.

---

[1] The paragraph mentioned above as (3) is the fifth and last paragraph of the judgment, but, for convenience of discussion, it will be referred to as paragraph (3). The third and fourth paragraphs have no bearing on the questions involved in this appeal.

This was in accordance with the desire of the mother. The mother did not want the father to have anything to do with the child.

The child was placed in a foster home by the Child and Family Service three days after her birth. Thereafter, the father contacted the agency with his attorney to inform it that he planned to obtain the custody of the child.

The mother filed her petition on March 19, 1969, pursuant to HRS § 571-61, which provides that the legal parents of a child or the mother of a child born out of wedlock, who desire to relinquish parental rights to the child and thus make the child available for adoption, may petition the family court for entry of a judgment of termination of parental rights. In the petition, the mother sought, in addition to a judgment of termination of her parental rights, an adjudication that the father had no parental rights to the child, and, if he did, that a termination of such rights was necessary for the protection and preservation of her best interests and to facilitate her adoption.

When a petition under HRS § 571-61 is filed, HRS § 571-62 requires that a notice of time and place of the hearing be given to the department of social services and permits any child-placing organization approved by the department to appear with or in the place of the department.

Under HRS § 571-63, the family court is empowered: to terminate the parental rights of the parents or parent seeking termination; to transfer the custody of the child to any person not forbidden by law to place a child for adoption, the department of social services, or any child-placing organization approved by the department; to appoint a guardian of the person of the child; and to authorize the person, department, agency, or guardian to consent to adoption.

HRS §§ 571-61 to 571-63 are parts of the chapter on family courts. HRS § 571-1 enjoins the family courts to

construe the chapter liberally to the end that the best interests of any child coming within their jurisdiction be served. Under HRS § 571-3, the family courts exercise general powers of equity in any case in which they have jurisdiction.

Paragraphs (1) and (2) of the judgment appealed from were entered pursuant to HRS § 571-63. Paragraph (3) is a simple declaration that there is no Hawaii law which gives any parental rights to a putative father and the additional relief sought by the mother did not come within the purview of the statutory provisions relating to termination of parental rights.

Although there is no law, statutory or otherwise, which requires that any notice of the time and place of hearing of a petition for termination of parental rights be given to a putative father, such notice was given in this case to the father. In response to the notice, the father appeared at the hearing with his counsel, and presented his case. He did not file any responsive pleading at any time. His case essentially was that he had a prior right to the child as against strangers in blood, although he also stated that he desired to be given consideration as adoptive father.

At the hearing, the presentation of the mother's case in chief took only a brief moment. The balance of the hearing was taken up in the presentation of the father's case. The case so presented developed sufficient evidence to enable the court to determine the question of the best interests of the child vis-a-vis the father. But the court ignored that aspect of the case, and focused its attention, insofar as the father was concerned, on the question of the existence or absence of legal rights to the child. It stated in its decision:

"This same kind of situation was presented in recent proceedings in this court, *In the Interest of* [*a child*] *Born May 2, 1967*, F.C. No. 67-9757-A, Civil No. 22953,

Termination No. 0177, decision filed May 31, 1968. In the referred proceedings, Judge Corbett discussed this general problem at length and concluded:

> 'That the natural father of the child does not have any custodial or other legal parental rights to the child which are subject to termination.'

"I will follow Judge Corbett's decision in this regard. As a matter of law in Hawaii, it is my opinion that the putative father of an illegitimate child has no rights in or to the child which require the mother or any person or agency to whom the mother has voluntarily relinquished the child to surrender the child to the father. The father may be considered as a possible adoptive parent, but this would be without any priority or right to first consideration."

Upon a review of the record, we reverse and remand the case for rehearing on the question as to whether the interests of the child would be best served by an award of her custody to the father. If the decision should be in the affirmative, the court could appoint the father as guardian of the person of the child pursuant to its authority under HRS § 571-63. An award of custody will follow as a corollary to such appointment and will be preliminary to the child's adoption by the father and his wife.

The decision that the father here has no parental rights is correct, if the sole focus of the court should be on the legal rights of the father. However, we think that in a case such as this, where the father has made a timely appearance and manifested a concern for the child, the focus of the court should be on the best interests of the child, and such concern should be given careful consideration, for it may disclose a probability of the development of a meaningful relationship conducive to the child's future welfare. The lot of a child born out of wedlock is an unenviable one without the court being overly tech-

nical. In any case involving such a child, the lodestar to be followed should always be the child's best interests. *In re Brennan,* 270 Minn. 455, 134 N.W. 2d 126 (1965); *In re Mark T.,* 8 Mich. App. 122, 154 N.W. 2d 27 (1967). It may be stated that the decision in F. C. 67-9757-A, Civil No. 22953, and Termination No. 0177, which the court professed to follow, contained a holding that "an award of the child to the child's natural father would not serve the best interest of the child," in addition to a holding that the father had no custodial or other legal parental rights.

In ordering a rehearing, we do so without providing any guidelines except to express our agreement with the court's statement in its decision that the father is "without priority or right to first consideration." The concept of the best interests of the child is one that is without any measuring rod. Necessarily, reliance must be placed on the wisdom of the family court. A decision made in the exercise of that wisdom, and which has support in the record, should stand. *In re Zink,* 269 Minn. 535, 132 N.W. 2d 795 (1964); *In re Mark T., supra.* If the paramount consideration in any case involving a child born out of wedlock is the best interests of the child, we see no reason for a rule which gives preference to the father.

There are cases which contain language according a right of first consideration to the putative father as against all the world, except the mother, provided that he is fit. Such language is based on nothing more substantial than an *a priori* assumption that "it may be * * * the child will have a better home with the putative father than with an entire stranger." *In re Shady,* 264 Minn. 222, 118 N.W. 2d 449 (1962). In all of such cases, the language is qualified with the statement that the right "must always be subordinated to the best interests of the child." *In re Zink, supra; In re Mark T., supra.* In practice the language does not mean much because trial courts make their

determination according to their own notion of fitness of the father and the best interests of the child, and such determinations are sustained on appeal unless they are clearly erroneous.

Reversed and remanded with direction to proceed in accordance with this opinion.

*Helen B. Ryan* (*Ryan & Ryan* of counsel) for appellant.

*Alana W. Lau,* Deputy Attorney General (*Bert T. Kanbara,* Attorney General, with her on the brief) for appellee.

---

### CONCURRING OPINION OF ABE, J.

The majority of the court remands this case for a determination whether it would be for the child's best interest to have her custody granted to her putative father and I concur on this remand. However, this court holds that a putative father has no parental right to a child born out of wedlock. I disagree.

It is uncontroverted that the appellant is the father of the child. He argues that as the putative father of the child he may be compelled to support and educate his child, therefore, he has the correlative right to the child's custody.

On the other hand the appellee contends that HRS § 578-2 requires consent only of the mother to the adoption of a child born out of wedlock, and not of the putative father, and therefore the putative father has no right to the care and custody of a child.

At ancient common law an illegitimate child was called "filius nullius,"[1] meaning "son of no one." This may have been so because the ancient "common law of England did not contemplate illegitimacy and, shutting its eyes to the facts of life, described an illegitimate child 'filius nullius.' "

---

[1] Blackstone Commentaries, 454-460 (7th ed. 1775).

*Galloway* v. *Galloway,* AC 299, 310, 311 (3 all Eng. Rep. 429, 431) (1955, HL) [1956]. It also appears that in carrying out this fiction of the nonexistence of an illegitimate child it was decreed that he came within the doctrine of "filius populi," which meant that he was a ward of the parish; neither parent having right to his custody.

Also this may have been the result because under ancient common law a father had absolute right to the custody of his *legitimate* child. But an illegitimate child had no legal father and, at that time, it did not occur to anyone that a mother of an *illegitimate* child should have the right to his custody. *Horner* v. *Horner,* 1 Hag Con 337, 351 (161 Eng. Rep. 573, 578) (1799) ; *Barnardo* v. *McHugh* [1891, HL] [1891] AC 388, 398.

Thus, an illegitimate child was son of no one—having no right to inherit from either his father or mother; no right to the surname of either parent; and no right to claim on either of them for support or education. It is said that this stern and inhumane policy was to encourage marriage and to discourage illicit intercourse.[2] However, it is generally recognized that such punishment of a child for the wrongdoings of his parents has no place in modern society and statutes have been enacted in England and in the United States granting and recognizing rights of children born out of wedlock.

In Hawaii under HRS § 577-14[3] an illegitimate child

---

[2] Clark v. Carfin Coal Co., (1891) AC 412, 427 per Earl of Selborne.

[3] "§ 577-14. *Illegitimate children; support, inheritance.* Except as otherwise provided by law. children whose parents have not been legally married, in contemplation of chapter 572, shall be denominated illegitimate, and shall not be entitled to inherit from their fathers, without express bequest; provided. that any person who in writing duly acknowledged before an officer authorized to take acknowledgments. declares himself to be the father of such children, shall be compellable to provide such children with necessary maintenance and support as if they were born in lawful wedlock. and to pay the expenses of the mother's pregnancy and confinement. The mothers in all cases shall be compellable to maintain and support them during their minority, and they shall be capable of taking by inheritance from the mother, without will."

has the right to inherit from his mother without will. And the mother may be compelled to support and educate a child. In other words, our statutes recognize the mother of an illegitimate child as his legal as well as his natural parent. A child's right to support does not end with the mother. Under HRS § 577-14 and HRS 579-4[4] a putative father of an illegitimate child may be compelled to support and educate him.

It is to be noted that in HRS § 571-1[5] which may be deemed the preamble to the Family Courts Act, the legislature proclaims that the care and custody of children shall be with their natural parents.[6] This is so even though in many cases strangers may be in a position to provide better homes for them. Many reasons may be found to support this policy. However, I believe the basic and primary reason is the recognition that the relationship between parent and child is the closest of any blood relationship, and that because of this flesh and blood relationship, natural parents would retain their concern for the welfare of a child even during periods of frustration, which may arise in all parent-child relationships. While on the other hand, under similar circumstances, adoptive parents

---

[4] § 577-14 provides for liability when a father *voluntarily acknowledges* the child as his and § 579-4 additionally provides for such liability upon an adverse finding in a paternity suit.

[5] "§ 571-1. *Construction and purpose of chapter.* This chapter shall be liberally construed to the end that families whose unity or well-being is threatened shall be assisted and protected, and restored if possible as secure units of law-abiding members; and that each child and minor coming within the jurisdiction of the court shall receive, preferably in his own home, the care, guidance, and control that will conduce to his welfare and the best interests of the State, and that when he is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to that which they should have given him."

[6] This may be merely a codification of this policy established by judicial precedent. *See* Prince v. Massachusetts, 321 U.S. 158, 166 (1944), where the United States Supreme Court stated, "It is cardinal with us that the custody, care and nurture of the child reside first in the parents. . . ."

may yield to the pressures and forget the welfare of the child.

Is this bond of blood between a parent and his child weakened because the child is born out of wedlock? The love between parent and child is universal and its existence is generally taken for granted, and therefore seldom if ever questioned. Thus love between parent and child cannot and should not be regulated by local laws of marriage and legitimacy. Therefore, I believe that the public policy of placing children in the custody of their natural parents applies to illegitimate as well as legitimate children.

The Michigan court correctly summarizes the development of law on the issue of custody of legitimate and illegitimate children as follows:

"Our examination of the decisional authorities convinces us that the resolution of disputes as to the custody of legitimate and illegitimate children has developed along parallel lines although such parallel development has been obscured by the fact that it was not coincident in time. At about the same time that the mother came to enjoy joint custody with the father of legitimate children, it was commonplace to state that the primary right to custody of illegitimate children belongs to the mother and that her right is good against all including the putative father, or conversely, the father has a custody right good against all but the mother." *In re Mark T.,* 8 Mich. App. 122, 137, 154 N.W.2d 27, 34 (1967).

It would appear that such development of law on the custody of children was logical and reasonable. A legitimate child usually lived in a household with both of his parents and, therefore, by logic and common sense I believe the courts ruled that both parents had joint custody of a child. Now, with an illegitimate child, it was generally impractical for his natural parents to have joint custody

of him, and courts have ruled that the mother had the primary right of custody. There is no question that under common law a mother's right to the custody of her illegitimate child is superior against the whole world. *See Wright v. Bennett,* 7 Ill. 587 (1845) ; *Wright* v. *Wright,* 2 Mass. 109 (1806) ; *Pierce* v. *Jeffries,* 103 W. Va. 410, 137 S.E. 651 (1927). The mother's primary right to custody, I believe, is founded upon the proposition that the natural love and affection of a mother for her child would generally be greater than that of anyone else, and that the best interest and welfare of a child would be subserved by allowing a mother to have the custody of her child. In Hawaii the mother not only has the right of custody but apparently full parental rights. However, this right to primary custody of a child should not give a mother authority to relinquish or cut off a putative father's right, if he has such a right.

It appears that by the early Nineteenth Century in *Priestly* v. *Hughes,* 11 East 1, 8-9 (1809), the English court recognized a putative father's right to custody of his illegitimate child. *See also Burwell's Case,* 86 Eng. Rep. 34; *King* v. *Cornforth,* 11 East 9.

In *Moritz* v. *Garnhart,* 7 Watts 302, 32 Am. Dec. Ann. 762, at page 764 (1838) the Pennsylvania court said: "the law recognises the rights of putative paternity for purposes of nurture and education." Also the same court in *Pote's Appeal,* 106 Pa. 574, 51 Am. Rep. 540 (1884) said at page 541: "The putative father of an illegitimate child is entitled to the custody of the child, as against all but the mother * * *." *See also Garrett* v. *Mahaley,* 199 Ala. 606, 75 So. 10 (1917) ; *In re Guardianship of Smith,* 42 Cal. 2d 91, 265 P.2d 888 (1954) ; *Wade* v. *State,* 39 Wash. 2d 744, 238 P.2d 914 (1951).

Thus under common law of England and some of our sister states it is recognized that a putative father has the

right to the care and custody of his illegitimate child. I believe the courts have held that this right springs from his relationship as the child's natural father based on the generally accepted concept that a father's love for his child, whether legitimate or illegitimate, is natural and universal; and that he has a sincere concern for the welfare of his child, which arises from his sense of responsibility to his own flesh and blood. In other words, a mother's right and a father's right to custody of an illegitimate child is and should be based on the same reason— the natural love and affection of a parent for her or his child.

Courts of other jurisdictions have reasoned that where a putative father can be compelled to support and educate his illegitimate child, there is a corresponding or coextensive right to his care and custody. *State in Interest of M,* —— Utah ——, 476 P.2d 1013 (1970) ; *In re Guardianship of C.,* 98 N.J. Super. 474, 237 A.2d 652 (1967); *Dellinger* v. *Bollinger,* 242 N.C. 696, 89 S.E.2d 592 (1955). *See also In Re Sunada,* 31 Haw. 328 (1930), where we said at page 329:

> "[T]he parent who is its natural guardian and who is responsible for the maintenance and support (in this case the mother) is not precluded by the mere surrender of its custody to a stranger from thereafter asserting her parental rights. Section 3042, R.L. 1925, referring to the duty of the mother of bastard children to support such children, provides that 'the female parent shall be compellable to maintain and support them during minority.' It would be an absurdity to say that a mother, upon whom this obligation is imposed and by whom it must be discharged, does not have the correlative right to the child's custody."

Thus, under either of the foregoing grounds it may be held that a putative father is entitled to the custody of a

child born out of wedlock. However, I believe the stronger reason for recognizing a putative father's right to the custody of his illegitimate child is the universally accepted concept of a father's love and affection for his child.

This proceeding for the termination of the parental rights of the mother of the child is prelude to an adoption. I am aware that HRS § 578-2 does not require the consent of the putative father for the adoption of an illegitimate child. I do not know whether his right[7] to notice and to be heard in the adoption of his illegitimate child was overlooked or intentionally omitted by the legislature when the statute was enacted. This oversight or omission may be because an overwhelming number of fathers of illegitimate children are not interested in taking custody of their offspring. Also it may be because laws with reference to adoption of children and the termination of parental rights have been drafted to encourage and expedite adoption of illegitimate children. I am also aware that such laws would facilitate the work of State agencies in the adoption process.

The State agency sees the procedure taken by the father here as a threat to the adoption of illegitimate children. They fear that if a father here may interfere with the adoption procedure, what is to prevent other fathers from claiming custody of children long after they have been in adoptive homes and thereby disrupt and destroy many happy families. Also, they fear because of possibilities of such disruptions and unpleasantness of possible court proceedings, qualifiied couples would be discouraged from making applications for adoption. However, does such fear justify the deprivation of the rights of a putative father?

---

[7] I believe HRS § 578-2 to the extent that it does not require the consent of or notice to a putative father of a hearing of the adoption of his illegitimate child, is constitutional suspect.

Also, the primary right of a mother and the secondary right of a father to the custody of an illegitimate child is also subject to the fundamental consideration—*what is the best interest and welfare of the child.* As this court has said: "the first and cardinal rule by which the courts were governed in awarding the custody was the welfare of the child, and not the technical legal right." *In Re Muranaka,* 26 Haw. 465, 466 (1922). *See also In Re Adoption of Watson Minors,* 45 Haw. 69, 361 P.2d 1054 (1961); *Re Thompson Minor,* 32 Haw. 479 (1932); *Yankoff* v. *Yankoff,* 40 Haw. 179 (1953).

Further, in answer to the objection we quote from *In Re Brennan,* 270 Minn. 455, 462, 134 N.W.2d 126, 131 (1965):

"Courts are well aware of the just concern of welfare agencies in a sound adoption program and appreciate that such a program is essential to the best interests of a great majority of children born out of wedlock. Courts are aware that removal of children from adoptive homes following placement may be harmful and, if accomplished frequently enough, will deter qualified and deserving prospective parents from applying for an adoptive child. The courts are also aware that the uncertainty as to its status is not only harmful to the child but also frustrates and makes more difficult the work of the adoption agencies.

"But we think it should be said in light of judicial experience that the expressed fears of the welfare agencies are not entirely warranted. It has not been the policy of the courts to prefer the claims of the unwed father as opposed to the claims of welfare agencies where the granting of the father's claim would be harmful to the child's welfare."

As I have noted above the fundamental rule in the determination of the custody of or in the adoption of a

minor child is *what is in his best interest.* And ever since the courts discarded the filius nullius rule and became concerned over the best interest of the illegitimate child, it appears that many courts have granted the natural father custodial preference second only to the mother, under the presumption that this will satisfy the child's best interests. Thus, in my opinion a putative father is entitled to the care, custody and control of a child born out of wedlock as against all but the mother, if he is competent and qualified to care for the child and if it appears that granting custody of the child to the putative father will be for the best interest of the child. Therefore, it appears to me that in order to make this determination a court must consider the willing father of an illegitimate child; and not to do so is to exclude a very important and necessary factor from consideration in the application of this rule.

I would thus reverse and remand.